UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COINTELLIGENCE FUND LP, ON YAVIN, and ONLINE PERFORMANCE OÜ,

Plaintiffs,

-v.-

BALLER ENTERTAINMENT LTD, ASTRONOMICA, INC., JONATHAN WEINBERG, and DOES 1-10,

Defendants.

25 Civ. 4472 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Before this Court is a crypto token compensation dispute masquerading as a federal securities action. In 2024, Plaintiff On Yavin, a foreign national, entered into a consulting agreement with Defendant Baller Entertainment Ltd ("Baller"), a foreign company, to advise on Baller's blockchain strategy, tokenomics, and game development. As part of the agreement, Mr. Yavin received a private distribution of Beast Coin, the crypto token and in-game currency used in Beast League, a blockchain game. However, unbeknownst to Mr. Yavin, Baller had already abandoned Beast League and shifted to developing a new blockchain game, Boinkers. Without the Beast League ecosystem to generate demand, Mr. Yavin's compensation was effectively worthless. When Mr. Yavin learned that Beast League was defunct, and Baller refused to exchange his Beast Coin for Boinkers Coin, he, along with the Cointelligence Fund LP (the "Fund") and Online Performance OÜ ("Online Performance," together with the Fund, the "Entity Plaintiffs," and collectively

with Mr. Yavin, "Plaintiffs"), filed a lawsuit against Baller, Astronomica Inc. ("Astronomica"), and Jonathan Weinberg (collectively with Baller and Astronomica, "Defendants"), as well as unnamed corporations and individuals.

Plaintiffs assert a host of state contract claims, but this Court's ability to consider them effectively rises and falls with their federal securities claim. As a threshold matter, the Court concludes that it has personal jurisdiction over all three Defendants, but that principles of *forum non conveniens* compel dismissal of the claims against Astronomica. From there, the Court proceeds to consider the merits of Plaintiffs' federal claim as to the remaining Defendants. It assumes, without deciding, that Mr. Yavin's compensation agreement for Beast Coin qualifies as an "investment contract" under the *Howey* test. *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946). The key issue, then, is whether a private agreement between a foreign individual and a foreign company to receive unregistered crypto tokens constitutes a domestic securities transaction, as contemplated in *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247 (2010). The Court concludes that it does not. Accordingly, and as set forth in the remainder of this Opinion, the Court grants Defendants' motion to dismiss Plaintiffs' complaint in full.

# BACKGROUND[1]

## A. Factual Background

### 1. The Parties

Mr. Yavin is a resident of London, England, and a former resident of Tallinn, Estonia. (FAC ¶ 6; Ex. J, K). By his own account, Mr. Yavin is "a serial entrepreneur, an angel investor, and a widely regarded authority" in the blockchain industry. (FAC ¶ 13). For over 20 years, Mr. Yavin has provided seed funding and strategic advice to founders looking to make it big in the cryptocurrency space. (*Id.* ¶¶ 13-14; Pl. Opp. 3). In exchange, Mr. Yavin has "typically" received "money, shares in the venture, and/or allocations of the relevant cryptocurrency." (FAC ¶¶ 13-14; Pl. Opp. 3).

In early 2021, Mr. Yavin began investing his time and money into the emerging blockchain gaming industry. (FAC ¶¶ 15-16). Some additional

---

[1] This Opinion draws its facts from the First Amended Complaint ("FAC" (Dkt. #1)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). The Court also relies on certain exhibits to the FAC (cited using the convention "Ex. [ ]"), which are attached to and incorporated by reference in the FAC. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint). Finally, the Court relies, as appropriate, on the Declaration of Defendant Jonathan Weinberg in support of Defendants' motion to dismiss ("Weinberg Decl." (Dkt. #34)). *See Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 83, 86 (2d Cir. 2013) (per curiam) (clarifying that on a Rule 12(b)(2) motion, a district court may consider "sworn declarations" from both sides); *see also Gulf Ins. Co.* v. *Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (holding that the Rule12(b)(2) standard applies to a Rule 12(b)(3) motion); *Alcoa S.S. Co.* v. *M/V Nordic Regent*, 654 F.2d 147, 158-59 (2d Cir. 1980) (en banc) (explaining that court may consider affidavits on a motion to dismiss for *forum non conveniens*).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #35); to Plaintiffs' memorandum of law in opposition to Defendants' motions to dismiss as "Pl. Opp." (Dkt. #39); and to Defendants' reply memorandum of law in further support of their motion as "Def. Reply" (Dkt. #42).

context on gaming is therefore useful to the Court's analysis of Plaintiffs' claims. In traditional non-blockchain gaming, players "pay to play" mainly for entertainment, with game publishers owning all aspects of the game. *See* Xuan-Thao Nguyen, *Blockchain Games and a Disruptive Corporate Business Model*, 6 STAN. J. BLOCKCHAIN L. & POL'Y 43, 78-79 (2023).[2] In many games, players can earn in-game items or virtual goods to improve their experience or use real money to buy in-game currency for specific items. *Id.* However, these items are not the players' actual property. *Id.* The publisher can at any time change, revoke, or expressly prohibit trading these assets, eliminating any real extrinsic value they might have. *Id.* Blockchain gaming flips this traditional model on its head by moving in-game asset ownership out of the game and onto players' public, decentralized blockchain ledgers. *Id.* at 71 (Blockchain gaming transforms players into "producers" and "owners of new property with [potential] market value."). This is how it works: Players access the game online and then "play to earn and own" in-game crypto assets, such as cryptocurrency rewards or non-fungible tokens ("NFTs"). *Id.* at 67. These crypto assets are recorded on the blockchain and stored in players' wallets. Players can then use, trade, or sell crypto assets to other players independent of the game. Although these crypto assets originate within the blockchain game, they can carry real-world value if there is genuine demand for them. *See, e.g.*, *id.* at 66-71 (noting that the rarest "Axies" NFTs earned through the

---

2 The Court cites this article only as pertinent background on blockchain gaming; it does not factor into the Court's substantive motion-to-dismiss analysis.

blockchain game, Axie Infinity, "were sold in the hundreds of thousands of dollars" in 2021).

Mr. Yavin created the Fund at the beginning of 2021 to invest in "early-stage venture capital … centered on blockchain-based gam[ing]." (FAC ¶ 15; Pl. Opp. 3). The Fund is a limited partnership organized under the laws of Gibraltar. (Ex. B at 1). It maintains its principal offices in London, where Mr. Yavin currently resides. (FAC ¶¶ 6-7). Mr. Yavin sometimes used the private company, Online Performance, to conduct his foray into blockchain gaming. (Ex. J at 1). Online Performance maintains principal offices in Tallinn, Estonia, where Mr. Yavin used to reside. (FAC ¶ 8; Ex. J, K).

Defendant Weinberg is a California resident. (FAC ¶ 11; Weinberg Decl. ¶ 3). In 2021, Mr. Weinberg began developing the mobile blockchain gaming universe, "Beast League." (FAC ¶ 19; Pl. Opp. 3). As originally conceived, players would download Beast League onto their mobile devices and compete in "skill-based games for fun, glory, and Beast Coin" (FAC ¶ 21) — the crypto token at issue in this case. Beast League would revolve around a fixed number of Beast Coin, the in-game currency players could use to "purchase limited edition collectibles, gain entry to exclusive tournaments, participate in special events & much more." (*Id.* ¶¶ 20, 24; Ex. A at 2). Beast Coin would be stored in players' "Beast Wallet[s]" and presumably traded outside of the gaming platform on the blockchain. (Ex. A at 5). At the outset, Mr. Weinberg intended for Beast League to feature a wide array of games. (FAC ¶¶ 22-23). Yet, to this day, Beast League has only one game: basketball in 1v1 and 2v2

settings. (*Id.*; Ex. A at 7 (noting on Beast League's website that "[c]urrently, the first mode is Basketball … [but] [a]dditional modes such as soccer, fighting, and more will be available in the future")).

Mr. Weinberg is the principal of the limited liability company Baller. (FAC ¶ 9; Weinberg Decl. ¶ 11). By and large, Baller was the primary developer and contracting party for Beast League-related agreements with service providers. (FAC ¶¶ 19, 40). It is unclear where Baller maintains its principal offices. (*Compare id.* ¶ 9 ("Baller's principal offices are located in the State of California"), *with Ex.* G (listing Baller's "Current Registered Office" in the British Virgin Islands), *and* Weinberg Decl. ¶ 12 (Baller's "principal place of business [is] in the British Virgin Islands")). Baller was organized in the British Virgin Islands through Otonomos, a business that is affiliated with other entities that will soon become relevant, OtoCorp Limited ("OtoCorp") and Otonom Ltd. (FAC ¶¶ 33-35; Ex. D, K). Companies like Otonomos purportedly protect cryptocurrency owners' assets by shielding them in more favorable jurisdictions. (FAC ¶ 33; Ex. C). Since March 2025, Baller has not been in good corporate standing in the British Virgin Islands. (FAC ¶ 45; Ex. G (deeming Baller to be "[i]n [p]enalty" of its corporate obligations)).

Mr. Weinberg also controls Astronomica, which was incorporated in Delaware in September 2021 as Acid Labs, Inc. ("Acid Labs"). (FAC ¶ 10; Weinberg Decl. ¶¶ 26-27). Astronomica's principal place of business is in California. (FAC ¶ 10; Weinberg Decl. ¶ 27). Astronomica has owned Beast League's website since at least as early as March 2024 (FAC ¶ 43; Ex. F at 2, 9

(listing Astronomica's business address)), and has held the trademark registration for "BEAST LEAGUE" since October 2024 (FAC ¶ 42; Ex. E at 2 (listing the application filing date as May 24, 2023, and registration date as of October 29, 2024)). Like Baller, Astronomica has faced its own regulatory challenges. Astronomica lost its legal right to operate in California in May 2025 (FAC ¶ 46; Ex. H (listing Astronomica's corporate status as "FTB forfeited" in uncertified records)), and has fallen out of good standing in Delaware (FAC ¶ 47; Ex. I (unofficially listing Acid Labs's status as "Void, AR's or Tax Delinquent")).

**2. The Development of Beast League**

In or around 2021, Mr. Weinberg took his blockchain game to market. (FAC ¶ 19). He persuaded investors to fund Baller's development of Beast League in exchange for allocations of Beast Coin. (*Id.* ¶ 25). Mr. Weinberg represented that Baller would use these funds to create and promote new games in the Beast League universe, with the goal of increasing Beast League's online visibility, growing its active user base, and driving up demand for Beast Coin. (*Id.* ¶¶ 25-27). Baller would then conduct an initial coin offering of Beast Coin. (*Id.* ¶ 26). This meant Baller would sell Beast Coin to the public on cryptocurrency exchanges, which would, in turn, drum up demand for Beast Coin. (*Id.*). If everything went according to Mr. Weinberg's plan, demand for Beast Coin would increase the value of investors' initial Beast Coin allocations, and investors would enjoy a profit. (*Id.*).

Mr. Yavin was among the early investors. On May 5, 2022, the Fund and Baller entered into a Simple Agreement for Future Tokens (the "SAFT"), negotiated by Mr. Yavin and Mr. Weinberg. (FAC ¶¶ 28-31; Ex. B). Pursuant to the SAFT, the Fund would invest $100,000 in Baller in exchange for a fixed allocation of Beast Coin. (FAC ¶ 31; Pl. Opp. 3). Allegedly, at that time, Defendants had been secretly and freely transferring "funds and assets" between Baller and Astronomica, offloading Beast League's liabilities onto Baller while shifting Beast League's assets to Astronomica. (FAC ¶¶ 32, 37-38). However, it is unclear what funds, assets, and liabilities were actually transferred.

Since the Fund's May 2022 investment in Baller, Mr. Yavin had unofficially advised Mr. Weinberg and Baller "on virtually every aspect of the development and launch of Beast League and the Beast Coin token[.]" (FAC ¶ 49). Mr. Yavin formalized this arrangement on September 13, 2023, when Baller and Online Performance entered into a consulting agreement (the "First Advisor Agreement"). (*Id.* ¶¶ 35, 51; Ex. J). OtoCorp and Mr. Yavin executed this document at some undisclosed location. (Ex. J at A-4). Under the First Advisor Agreement, Mr. Yavin would serve as an independent contractor to Baller, advising on Baller's blockchain gaming strategy, tokenomics, and development. (FAC ¶¶ 51-52; Ex. J at 1-2; Pl. Opp. 4). As his "sole compensation," Mr. Yavin would receive 1,000,000 Beast Coin tokens, a quantity which would gradually vest over a predetermined schedule. (Ex. J at 1, A-4). Beast Coin had no value independent of Beast League. (FAC ¶ 84). If

Beast League failed, Beast Coin — and the parties' investment of time, energy, and money into its development — would amount to nothing. (*Id.* ¶ 85).

The First Advisor Agreement was "governed by and construed in accordance with the laws of the State of California," and it compelled the parties to bring any potential lawsuit in federal or state courts in the Northern District of California. (Ex. J at 5 ("[T]he parties irrevocably consent to the personal jurisdiction and venue [in the Northern District of California].")). The agreement also included an integration clause stating that the First Advisor Agreement "constitute[s] the complete and exclusive understanding and agreement of the parties with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, with respect to its subject matter," and that "[a]ny waiver, modification[,] or amended of any provision … will be effective only if in writing and signed[.]" (*Id.*). Mr. Yavin fully performed under the First Advisor Agreement. (FAC ¶¶ 53, 68).

Beyond his contractual obligations, Mr. Yavin also solicited outside investment. (FAC ¶¶ 54-57; Pl. Opp. 4). Between 2022 and 2024, Mr. Yavin credits himself with raising approximately $1 million in funding for Baller. (FAC ¶¶ 54-57; Pl. Opp. 4). This infusion of funds was supposedly integral to keeping Baller's doors open because, unbeknownst to Plaintiffs at the time, the company had allegedly begun to experience severe financial difficulties. (FAC ¶¶ 56, 58). Defendants continued to transfer assets from Baller to Astronomica covertly, including some of the Fund's contributions. (*Id.* ¶ 59). Such asset transfers can raise red flags for prospective investors, signaling that

a company may be moving valuable assets out of liable entities to elude its creditors.

In February 2024, Mr. Yavin remained oblivious to Baller's flailing financial performance. (FAC ¶¶ 59-60). Mr. Weinberg approached Mr. Yavin, who was still performing under the First Advisor Agreement, to negotiate a new agreement as extra "motivat[ion]" for his continued consulting services. (*Id.* ¶¶ 60, 64; Pl. Opp. 4). Mr. Weinberg initially offered Mr. Yavin equity in Baller and a contingent cash return. (FAC ¶ 62; Pl. Opp. 4). Mr. Yavin refused, and the parties continued to negotiate. (FAC ¶¶ 63-66; Pl. Opp. 4). During the almost daily negotiations, Mr. Yavin made it clear that his sole focus was the development of Beast League. (FAC ¶¶ 80, 83). Mr. Weinberg repeatedly assured Mr. Yavin that Baller was "fully committed" to developing Beast Coin (*Id.* ¶¶ 69-71; Pl. Opp. 4), and further clarified in writing on March 10, 2024, that Baller's "current development efforts all relate[ ] to marketing the Beast Coin token." (FAC ¶ 71).

Finally, on April 11, 2024, Mr. Yavin and Baller executed the Second Advisor Agreement (the "Second Advisor Agreement"). (FAC ¶ 77; Ex. K at 1, 5). Plaintiffs allege that Mr. Weinberg negotiated and executed the Second Advisor Agreement while in California. (FAC ¶ 72). But Mr. Weinberg was not the signatory; OtoCorp Limited was. (*Id.* ¶ 35; Ex. K at 5, A-2 (signing off as "pp OtoCorp Limited" meaning "by proxy" of OtoCorp Limited)). Pursuant to the Second Advisor Agreement, Mr. Yavin would continue to "provide reasonable assistance and support to [Baller] in addressing any needs or challenges that

may arise in the course of executing [Baller's] vision and objectives," in exchange for 1.5% of the total Beast Coin supply, which would "undergo gradual vesting according to the predetermined schedule[.]" (FAC ¶¶ 78-79; Ex. K at A-1; Pl. Opp. 4). The agreement's plain terms did not limit Mr. Yavin's consulting services solely to Beast League. (Ex. K).

As before, the Second Advisor Agreement contained an integration clause stating that it "constitute[s] the complete and exclusive understanding and agreement of the parties with respect to its subject matter and supersedes all prior understandings and agreements, whether written or oral, with respect to its subject matter," and, further, that "[a]ny waiver, modification or amendment of any provision … will be effective only if in writing and signed by the parties." (Ex. K at 5). However, unlike the First Advisor Agreement, the parties designated New York as the governing law and the preferred forum for suit. (*Id.*). Under the First and Second Advisor Agreements, Mr. Yavin "earned and received" in the aggregate 3.5% of the total supply of Beast Coin. (FAC ¶ 81).

**3. The Collapse of Beast League and the Rise of Boinkers**

On April 24, 2024 — 13 days after the execution of the Second Advisor Agreement — Mr. Weinberg messaged Mr. Yavin with a series of revelations. (FAC ¶ 86; Pl. Opp. 5). Mr. Weinberg admitted that he had allocated too much Beast Coin to investors without reserving enough for influencers and the community, which had the unintended effect of limiting Beast Coin's upside potential. (FAC ¶ 87). Influencers and players often drive demand for various cryptocurrency tokens. Mr. Weinberg distributed so much Beast Coin to

investors upfront that he could not earmark enough for influencer promotions or player rewards, which could have the second-order effect of stagnating demand for Beast Coin. Next, Mr. Weinberg expressed concern regarding "the high future dilution value … of Beast Coin, which created a significant risk of dilution and future selloffs for the token." (*Id.*). Said differently, Mr. Weinberg worried that too much Beast Coin was set to be released, which would flood the market and dilute the coin's current value.

Most importantly, Mr. Weinberg revealed for the first time that he was "considering" developing another blockchain game "[s]imultaneously with Beast League." (FAC ¶ 88; Pl. Opp. 5). Shortly thereafter, Mr. Weinberg began to circulate his idea for a new blockchain game, Boinkers, which centered on earning Boinkers Coin; all the while, Mr. Weinberg promised to dedicate Baller's resources to developing Beast League and Boinkers "jointly." (FAC ¶¶ 89-90; Pl. Opp. 5). In reliance on this promise, Mr. Yavin continued to perform under the Second Advisor Agreement, and began counseling Baller on the development of Beast Coin and Boinkers. (FAC ¶¶ 91-92; Pl. Opp. 5). About a month later, on May 23, 2024, Acid Labs tweeted: "We're excited to announce the dawn [of] our next chapter. What once began as @playBeastLeague has now blown up into something much bigger." (FAC ¶ 93). Upon reading this post, Mr. Yavin began to worry. (*Id.* ¶¶ 94-95; Pl. Opp. 5). If Mr. Weinberg and Baller abandoned Beast League, then Mr. Yavin's compensation package of 3.5% of the Beast Coin token supply would

effectively be nil, given that the token's value depended entirely on the popularity of Beast League. (FAC ¶ 94; Pl. Opp. 5).

Mr. Yavin voiced his concerns to Mr. Weinberg. (FAC ¶ 95; Pl. Opp. 5). On May 24, 2024, Mr. Weinberg assured Mr. Yavin in writing that "investors in Beast Coin would have the right to swap their allocations of Beast Coin for the new token (Boinkers Coin) when it became relevant," and that "holders of Beast Coin would have the right to receive a commensurate amount of Boinkers Coin tokens[.]" (FAC ¶ 96; Pl. Opp. 5). The proposed token swap assuaged Mr. Yavin's immediate concerns, but various details still did not add up. (FAC ¶¶ 96-97). For instance, Acid Labs tweeted artwork and concepts for various characters associated with Boinkers as soon as May 28, 2024. (*Id.* ¶ 97). And by June 3, 2024, Acid Labs was tweeting actual gameplay footage. (*Id.*). The timing of these posts — mere weeks after Mr. Weinberg disclosed that he was "considering" a second project — was suspect. (*Id.*). Plaintiffs believe that the speed with which Boinkers was unveiled meant that Mr. Weinberg was considering and already developing Boinkers long before Mr. Yavin signed the Second Advisor Agreement. (*Id.* ¶¶ 97, 102, 118; Pl. Opp. 5).

Nevertheless, Mr. Yavin continued to perform under the Second Advisor Agreement and advise on Boinkers's development. (FAC ¶ 98). He was repeatedly praised for his insights and was openly lauded by Mr. Weinberg as "the most valuable and significant of [Baller's] advisors[.]" (*Id.* ¶¶ 99-100). Even so, by the end of July 2024, Mr. Weinberg and Baller had effectively abandoned Beast League in favor of Boinkers. (*Id.* ¶¶ 102, 104-106; Pl.

Opp. 5). Mr. Weinberg did not inform Mr. Yavin of this development. (FAC ¶ 106). To the contrary, on September 5, 2024, Mr. Weinberg affirmatively represented that he had not abandoned Beast League, and that Beast Coin remained fully relevant. (*Id.* ¶ 115). Yet, on July 29, 2024, Beast League posted its last tweet (*id.* ¶¶ 104, 105); the promised "Expansion" of the "Roadmap" section of Beast League's website "Q4/2024" never saw the light of day (*id.* ¶ 105); and the "Get Support" option on its website was inactive as of the filing of the FAC (*id.* ¶ 105).

Boinkers officially launched in August 2024 as a product of Acid Labs. (FAC ¶¶ 107-109; Pl. Opp. 5). However, Boinkers's Privacy Policy listed Baller as its owner as recently as April 9, 2025. (FAC ¶¶ 109-110; Ex. L at 1, 8; Pl. Opp. 5). The Privacy Policy was later amended to reflect Acid Labs as its true owner (Ex. M at 1), though Baller's registered address is still erroneously listed in Boinkers's privacy policy (*compare* Ex. G at 1, *with* Ex. M at 7). Boinkers proved enormously successful, attracting eleven million monthly users and millions of dollars in outside investment. (FAC ¶ 108; Pl. Opp. 5). On September 5, 2024, Mr. Yavin asked Mr. Weinberg to reaffirm his commitment to their token swap. (*Id.* ¶ 112). In response, Mr. Weinberg stated that none of the founders was entitled to 3.5% of the total token supply, but expressed optimism that he and Mr. Yavin would reach a mutually acceptable agreement. (*Id.* ¶¶ 113-114). Unfortunately, they did not: Mr. Weinberg refused to exchange Mr. Yavin's Beast Coin for Boinkers Coin or to pay Mr. Yavin's monthly retainer. (*Id.* ¶ 116; Pl. Opp. 6).

Negotiations between Mr. Weinberg and Mr. Yavin broke down, and on October 16, 2024, the Second Advisor Agreement was terminated. (FAC ¶ 117; Pl. Opp. 6). Ultimately, Plaintiffs were left with a $100,000 loss on their investment, 3.5% of the Beast Coin supply tied to a dead project, and uncompensated advisory services. (FAC ¶¶ 120-121; Pl. Opp. 6).

**B. Procedural Background**

On May 29, 2025, Plaintiffs filed a Complaint in this Court against the three Defendants and unnamed corporations and individuals. (Dkt. #1). On September 30, 2025, Defendants filed a pre-motion letter in anticipation of moving to dismiss Plaintiffs' Complaint. (Dkt. #20). Plaintiffs filed their opposition to Defendants' request on October 3, 2025. (Dkt. #21). In light of both submissions, the Court scheduled a pre-motion conference, which was held on October 15, 2025. (Dkt. #22; *see* October 15, 2026 Minute Entry). At the conference, the Court gave Plaintiffs an opportunity to amend their Complaint and proposed a briefing schedule for the anticipated motion to dismiss. (October 15, 2025 Minute Entry).

Pursuant to that briefing schedule, Plaintiffs filed their FAC on November 14, 2025. (Dkt. #26, 27). The Court granted Plaintiffs' leave to file portions of the FAC under seal (Dkt. #25, 28), and denied Defendants' subsequent request to seal additional portions (Dkt. #32, 41). In the FAC, Plaintiffs brought eight causes of action, seven of which arise under state law. (FAC ¶¶ 122-200). These claims include: (i) New York common-law breach of the covenant of good faith and fair dealing implied in the First and Second

Advisor Agreements (*id.* ¶¶ 122-130); (ii) British Virgin Islands common-law breach of the covenant of good faith and fair dealing implied in the SAFT (*id.* ¶¶ 131-141); (iii) New York common-law recovery in quantum meruit for Plaintiffs' advisory services (*id.* ¶¶ 142-152); (iv) New York common-law unjust enrichment for Plaintiffs' investment and advisory services (*id.* ¶¶ 153-158); (v) promissory estoppel to enforce the token swap agreement (*id.* ¶¶ 159-163); (vi) negligent misrepresentation based on Defendants' special relationship of trust and confidence with Mr. Yavin (*id.* ¶¶ 164-173); and (vii) New York common-law fraudulent inducement to accept the Second Advisor Agreement (*id.* ¶¶ 174-182). The eighth and only federal cause of action is a claim for violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (*Id.* ¶¶ 183-200). Plaintiffs seek a declaration that Defendants acted willfully and intentionally to harm Plaintiffs financially and reputationally; an injunction barring Defendants from publicly offering Boinkers Coin and requiring them to use the remainder of the Fund's investment to compensate Plaintiffs; compensatory and punitive damages for no less than the value of the token swap, plus interest; and attorneys' fees and costs. (FAC at 34-35).

On December 26, 2025, Defendants filed their motion to dismiss the FAC, along with supporting papers. (Dkt. #33-35). Plaintiffs filed their opposition on January 23, 2026. (Dkt. #39). Defendants filed their reply on February 6, 2026. (Dkt. #42).

## DISCUSSION

Before turning to the merits of Plaintiffs' claims, the Court considers several threshold issues. *First*, it considers whether it has personal jurisdiction over Defendants, and concludes that it does. *See Fuld* v. *Palestine Liberation Org.*, 606 U.S. 1, 11 (2025) (quoting *Lightfoot* v. *Cendant Mortgage Corp.*, 580 U.S. 82, 95 (2017) ("We have long held that a 'court must have ... power over the parties before it (personal jurisdiction) before it can resolve a case.'")). *Second*, it considers whether any of the claims should be dismissed pursuant to the doctrine of *forum non conveniens*, and answers that question in the affirmative as to Defendant Astronomica. *Third*, with these antecedent issues resolved, the Court assesses whether Plaintiffs have adequately pleaded the federal securities claim on which its subject matter jurisdiction rests. After concluding that they have not, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claims.

### A. The Court Has Personal Jurisdiction over Defendants for the Federal Claim

#### 1. Applicable Law

To defeat a motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction, a "plaintiffs need only make a *prima facie* showing of personal jurisdiction over the defendants." *Sullivan* v. *UBS AG*, 149 F.4th 206, 217 (2d Cir. 2025) (alterations adopted) (quoting *Chloé* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Penguin*

*Grp. (USA) Inc.* v. *Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks omitted and alterations adopted) (quoting *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)). Critically, a plaintiff must establish the court's jurisdiction "with respect to each claim asserted." *Sullivan*, 149 F.4th at 217 (internal quotation marks omitted) (quoting *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018)).

When evaluating a Rule 12(b)(2) motion, a court must "view[ ] all facts in the light most favorable to the non-moving party." *TradeComet.com LLC* v. *Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc.* v. *Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (internal quotation marks and citation omitted); *see also Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 83, 86 (2d Cir. 2013) (per curiam) (clarifying that, on a Rule 12(b)(2) motion, a district court may "consider[ ] materials outside the pleadings," such as "sworn declarations," so long as court's ultimate inquiry remains "whether [plaintiff] ha[s], through its pleadings and affidavits, made a *prima facie* showing of personal jurisdiction notwithstanding any controverting presentation by [defendant]" (internal quotation marks and citation omitted)). However, a court should "not draw argumentative inferences in the plaintiff's favor," and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on*

*Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks and citation omitted).

A court may have personal jurisdiction if the "[p]arties ... consent to personal jurisdiction through forum-selection clauses in contractual agreements." *D.H. Blair & Co., Inc.* v. *Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). Absent consent, a court may have personal jurisdiction over a defendant either as a matter of (i) "general" or "all-purpose" jurisdiction or (ii) "specific" or "conduct-linked" jurisdiction. *Daimler AG* v. *Bauman*, 571 U.S. 117, 122 (2014). "Specific jurisdiction is available when the cause of action sued upon arises out of the defendant's activities in a state." *Brown* v. *Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016). "General jurisdiction, in contrast, permits a court to adjudicate any cause of action against the ... defendant, wherever arising, and whoever the plaintiff." *Id.*

"A federal court's exercise of personal jurisdiction is both statutory and constitutional in nature, 'requir[ing] satisfaction of three primary requirements.'" *NLRB* v. *Universal Smart Conts., LLC*, 166 F.4th 304, 314 (2d Cir. 2026) (quoting *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012)). *First*, "the plaintiff's service of process upon the defendant must have been procedurally proper." *Id.* (quoting *Licci*, 673 F.3d at 59); *see also* Fed. R. Civ. P. 4(k)(1) (providing that service of process "establishes personal jurisdiction over a defendant"). *Second*, there must be a statutory basis for personal jurisdiction under state or federal law that "renders such service of process effective." *Universal Smart Conts., LLC*, 166 F.4th at

314 (quoting *Licci*, 673 F.3d at 59); *see also* Fed. R. Civ. P. 4(k)(1)(A), (C) (allowing district courts to exercise personal jurisdiction to the same extent as "a court of general jurisdiction in the state where the district court is located" or "when authorized by a federal statute"). And *third*, the district court's assertion of personal jurisdiction must otherwise "comport with constitutional due process principles." *Universal Smart Conts., LLC*, 166 F.4th at 314 (quoting *Licci*, 673 F.3d at 60).

**2. Analysis**

**a. The Court Has Personal Jurisdiction over Defendants Weinberg and Astronomica**

Plaintiffs' securities fraud claims are governed by Section 27 of the Exchange Act, which "authorizes nationwide service of process." *Universal Smart Conts., LLC*, 166 F.4th at 315 (citing *Kidder, Peabody & Co.* v. *Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991)); 15 U.S.C. § 78aa(a) (providing that process "may be served in any ... district of which the defendant is an inhabitant or wherever the defendant may be found"). "Section 27 confers personal jurisdiction over a defendant who is served anywhere within the United States," to the limit of the Fifth Amendment's Due Process Clause. *Kidder, Peabody & Co.*, 925 F.2d at 562; *see also U.S. Titan, Inc.* v. *Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 n.12 (2d Cir. 2001) ("In determining whether personal jurisdiction exists over a foreign defendant who ... has been served under a federal service of process provision, a court should consider the defendant's contacts throughout the United States and not just those contacts with the forum." (internal quotation marks and citation omitted)); *Caplan* v.

*Dollinger*, 803 F. Supp. 3d 219, 233-34 (S.D.N.Y. 2025) (The Exchange Act "provides for [nationwide] service of process and permits the exercise of personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause." (internal quotation marks and citation omitted)). Defendants do not contest the propriety of Plaintiffs' service of process or Section 27's authorization of personal jurisdiction over the federal securities claim. (*See* Def. Reply 6-7). Rather, they argue that the Court's exercise of personal jurisdiction over them would not comport with the Due Process Clause of the Fifth Amendment. (*Id.*).

"The metes and bounds" of the Fifth Amendment's Due Process Clause are no longer "clearly delineated." *Caplan*, 803 F. Supp. 3d at 234. Under the Fourteenth Amendment, "[t]he due process test for personal jurisdiction 'has two related components: the minimum contacts inquiry and the reasonableness inquiry." *Davis* v. *Am. Broad. Co.*, No. 22 Civ. 5944 (KPF), 2024 WL 1178014, at *7 (S.D.N.Y. Mar. 19, 2024) (internal quotation marks omitted) (quoting *Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996)). The Second Circuit has long construed the Fourteenth Amendment's Due Process Clause as coextensive with the Fifth Amendment's Due Process Clause. *See, e.g.*, *Waldman* v. *Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016). But recently, the Supreme Court abrogated this line of Second Circuit precedent and "decline[d] to import the Fourteenth Amendment minimum contacts standard into the Fifth Amendment." *Fuld*, 606 U.S. at 16. As *Fuld* explains, "[t]he Constitution confers upon the Federal Government —

and it alone — both nationwide and extraterritorial authority," *id.* at 15, and "it makes little sense to mechanically import the limitations that the Fourteenth Amendment imposes on the authority of *state* courts, which is restricted consonant with the States' more constrained sovereign spheres," *id.* at 16. Thus, "the Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.*

Properly interpreted, "'the Due Process Clause of the Fifth Amendment … permits a more flexible jurisdictional inquiry' when the federal courts assess their personal jurisdiction over a defendant than that required by the Fourteenth Amendment, which constrains the judicial power of the states." *Provencher* v. *Bimbo Foods Bakeries Distribution LLC*, 175 F.4th 180, 187 (2d Cir. 2026) (quoting *Fuld*, 606 U.S. at 16). At the same time, the Supreme Court cautioned that "the prospect remains that the Fifth Amendment might entail a similar 'inquiry into the reasonableness of the assertion of jurisdiction in the particular case.'" *Fuld*, 606 U.S. at 23 (quoting *Asahi Metal Indus. Co.* v. *Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 115 (1987)). "Reasonableness … will depend in each case 'on an evaluation of several factors,' including 'the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.'" *Fuld*, 606 U.S. at 24 (quoting *Asahi*, 480 U.S. at 113). But "reasonableness" is "not … a free-floating test." *Daimler*, 571 U.S. at 139 n.20. Instead, the "multipronged reasonableness check" should only "be essayed when *specific* jurisdiction is at

issue." *Id.* (emphasis in original); *see also id.* ("[A]ny second-step inquiry would be superfluous" if "a corporation [were] genuinely at home in the forum State[.]").

Bearing all this in mind, the Court begins its analysis with the U.S.-based Defendants, Mr. Weinberg and Astronomica. Because there is no dispute about proper service or Section 27's applicability, the remaining issue is whether this Court's exercise of personal jurisdiction over Mr. Weinberg and Astronomica comports with Fifth Amendment due process. *See Universal Smart Conts., LLC*, 166 F.4th at 314 (quoting *Licci*, 673 F.3d at 60). The Court holds that it does.

"[W]here a federal statute authorizes nationwide service of process, the court may generally exercise personal jurisdiction, consistent with due process, over a properly served defendant who resides in the United States." *Orient Plus Int'l Ltd.* v. *Baosheng Media Grp. Holdings Ltd.*, 808 F. Supp. 3d 609, 617 (S.D.N.Y. 2025) (collecting cases); *see also Kidder, Peabody & Co.*, 925 F.2d at 562; *U.S. Titan, Inc.*, 241 F.3d at 152 n.12. "General jurisdiction over an individual comports with due process in the forum where he is 'at home,' meaning the place of 'domicile.'" *Reich* v. *Lopez*, 858 F.3d 55, 63 (2d Cir. 2017) (quoting *Sonera Holding B.V.* v. *Çukurova Holding A.Ş.*, 750 F.3d 221, 225 (2d Cir. 2014) (per curiam)); *see also In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 134 (S.D.N.Y. 2021) ("A Court has general personal jurisdiction over a defendant where the individual is domiciled."). "One may have more than one residence in different parts of this country or the

world, but a person may have only one domicile." *Reich*, 858 F.3d at 63 (quoting *United States* v. *Venturella*, 391 F.3d 120, 125 (2d Cir. 2004)). "In an 'exceptional case,' an individual's contacts with a forum might be so extensive as to support general jurisdiction notwithstanding domicile elsewhere, but the Second Circuit has yet to find such a case." *Id.* (quoting *Daimler*, 571 U.S. at 139 n.19). As to corporations, a court may exercise general jurisdiction "only in a state that is the company's formal place of incorporation or its principal place of business." *Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014).

Here, Plaintiffs allege sufficient contacts with the United States to support personal jurisdiction over Defendants Weinberg and Astronomica for the federal securities claim. Defendant Mr. Weinberg is a California resident (FAC ¶ 11), a fact he personally confirms in his declaration (Weinberg Decl. ¶ 3). Neither the FAC nor the declaration raises any doubt that Mr. Weinberg is domiciled in California. *See Reich*, 858 F.3d at 63. Similarly, Defendant Astronomica is incorporated in Delaware, and its principal place of business is in California. (FAC ¶ 10; Weinberg Decl. ¶ 27). Because "Section 27 confers personal jurisdiction over a defendant who is served anywhere within the United States," the Court need not pinpoint precisely the state in which Astronomica is domiciled. *Kidder, Peabody & Co.*, 925 F.2d at 562. For purposes of this analysis, it is enough to determine that Astronomica is "at home" in the United States, at large. *See Gucci Am., Inc.*, 768 F.3d at 135. With personal jurisdiction established over Defendants Mr. Weinberg and

Astronomica, any "reasonableness" inquiry under the Fifth Amendment would be "superfluous." *Daimler*, 571 U.S. at 139 n.20.[3] Accordingly, the Court may exercise personal jurisdiction over Mr. Weinberg and Astronomica.[4]

---

[3] To the extent that a "reasonableness" inquiry under the Fifth Amendment is still necessary after *Fuld*, the Court still retains jurisdiction over Mr. Weinberg and Astronomica. "Where, as here, a non-diversity action is brought under a federal law which provides for nationwide service of process, 'the reasonableness inquiry is largely academic because of the strong federal interests involved.'" *SEC* v. *Passos*, 760 F. Supp. 3d 95, 113 (S.D.N.Y. 2024) (internal citation omitted and alterations adopted). Courts have rarely "declined jurisdiction, on fairness grounds, in such cases." *Orient Plus Int'l Ltd.* v. *Baosheng Media Grp. Holdings Ltd.*, 808 F. Supp. 3d 609, 618 (S.D.N.Y. 2025) (quoting *SEC* v. *Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013)). This case presents no exception. Mr. Weinberg lives and works in California and would suffer little hardship litigating this case in New York. *Cf. Passos*, 760 F. Supp. 3d at 113 (finding no reasonableness barrier where noncitizen defendant spoke little English, lived abroad, and "ha[d] no ties to the United States" (citation omitted)). Astronomica, which is controlled by Mr. Weinberg, is in a similar position. *See id.* And "[t]he United States has a substantial interest in the enforcement of its securities laws and the protection of investors in United States securities markets." *Orient Plus Int'l Ltd.*, 808 F. Supp. 3d at 618 (quoting *Cromer Fin. Ltd.* v. *Berger*, 137 F. Supp. 2d 452, 479 (S.D.N.Y. 2001)).

[4] In the alternative, Plaintiffs contend that this Court may exercise personal jurisdiction over Defendants Weinberg and Astronomica because they are "closely related" to Defendant Baller, and Baller signed the Second Advisor Agreement with a New York forum selection clause. (Pl. Opp. 20-22). The Second Circuit "ha[s] permitted non-signatories to an agreement to be bound by ... forum selection clauses where, under the circumstances, the non-signatories enjoyed a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound." *Fasano* v. *Li ("Fasano IV")*, 47 F.4th 91, 103 (2d Cir. 2022). However, these cases did not consider the situation where "defendants object to the exercise of personal jurisdiction." *Seatig, Inc.* v. *BizLog, LLC*, No. 24 Civ. 7946 (JPO), 2025 WL 3101250, at *3 (S.D.N.Y. Nov. 6, 2025) (quoting *Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*, 356 F. Supp. 3d 379, 394 (S.D.N.Y. 2019)). Instead, they involved dismissal on the grounds of improper venue and *forum non conveniens*. *See Fasano IV*, 47 F.4th at 100; *see also Aguas Lenders Recovery Group* v. *Suez, S.A.*, 585 F.3d 696, 699 (2d Cir. 2009).

"[A]lthough a number of district court cases in this Circuit have embraced the closely related standard," recent opinions "have begun to question the blind application of this test to situations where a non-signatory objects to a signatory's enforcement of the forum-selection clause against him." *Avanti Sys. USA, LLC* v. *Sanchez*, No. 24 Civ. 6704 (KMK), 2025 WL 2773306, at *7 (S.D.N.Y. Sept. 26, 2025) (collecting cases) (internal quotation marks and citation omitted). As Judge Rakoff explained in *Arcadia Biosciences*:

> The rules governing personal jurisdiction ... are driven by constitutional concerns over the court's power to exercise control over the parties. Although the personal jurisdiction inquiry is not mechanical, it is constrained in ways that the venue inquiry is not. Most notably, a plaintiff must make a baseline showing that the defendant has certain minimum contacts with [the forum] such

**b. Defendant Baller Has Consented to Personal Jurisdiction**

The remaining inquiry is whether this Court has personal jurisdiction over the corporate entity Baller. As detailed in the remainder of this section, Plaintiffs may not have pleaded facts sufficient to make a *prima facie* showing of personal jurisdiction over Baller through Section 27's nationwide service of process provision. However, Baller has consented to personal jurisdiction by signing the Second Advisor Agreement, which includes a New York forum selection clause.

Baller is incorporated in the British Virgin Islands. (FAC ¶¶ 33-34; Ex. D, G; Weinberg Decl. ¶ 12). Plaintiffs allege that Baller maintains its

---

> that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Regardless of the convenience to the parties or the private and public interests at stake, a court cannot exercise personal jurisdiction unless the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.
>
> These constitutional requirements caution against a liberal application of forum selection clauses to non-signatory defendants. ... [T]he application of forum selection clauses to non-signatories has been justified by various policy benefits, including the contribution that such clauses have been praised for making to certainty in commercial transactions, the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended, the promotion of vital interests of the justice system, including judicial economy and efficiency, and the guarantee that parties will not be required to defend lawsuits in far-flung fora. But although these benefits may be salutary, a court cannot consider them without first determining whether the exercise of jurisdiction over the defendant comports with due process.

356 F. Supp. 3d at 394-95 (internal quotation marks and citations omitted). The Court observes that a growing number of courts have been "more critical" of extending the closely related doctrine to the personal jurisdiction context. *Avanti Sys. USA, LLC*, 2025 WL 2773306, at *7; *see also Seatig, Inc., LLC*, 2025 WL 3101250, at *3-4. Nonetheless, the Court does not address these arguments in light of its holding that it has personal jurisdiction over Mr. Weinberg and Astronomica.

principal offices in California (FAC ¶ 9), but this fact is controverted by Defendants' sworn declaration (Weinberg Decl. ¶ 12 (stating that Baller's "principal place of business [is] in the British Virgin Islands")), and an exhibit to Plaintiffs' own FAC (*see* Ex. G at 1 (listing Baller's "Current Registered Office" in the British Virgin Islands)). At least as to the location of Baller's principal offices, the Court need not accept as true that Baller's principal office is in California. *See Dorchester*, 722 F.3d at 83, 86; *see also Pablo Star Ltd.* v. *Welsh Gov't*, 170 F. Supp. 3d 597, 605 (S.D.N.Y. 2016) ("[T]he Court need not accept as true allegations controverted by the defendant's affidavits."). And, on the basis of these facts, Plaintiffs face an uphill battle demonstrating that Baller is essentially "at home" anywhere in the United States. (FAC ¶ 9; Weinberg Decl. ¶ 12; Ex. G). *See Orient Plus Int'l Ltd.*, 808 F. Supp. 3d at 617 (finding that defendant who "resides and works in the United States and does not dispute that he was properly served … ha[d] sufficient minimum contacts with the United States"); *see also NLRB* v. *Schmidt*, No. 23 Misc. 51 (VEC), 2023 WL 8005766, at *2 (S.D.N.Y. Nov. 16, 2023) (finding that defendants who lived in the United States and were properly served pursuant to a nationwide service-of-process provision had sufficient minimum contacts with the United States); *see also SLSJ, LLC* v. *Kleban*, No. 14 Civ. 390 (CSH), 2015 WL 1973307, at *12 (D. Conn. Apr. 30, 2015) (finding "the exercise of jurisdiction … justified if the defendant resides within the territorial boundaries of the United States and has been properly served." (internal quotation marks omitted)).

Similarly, Plaintiffs' conclusory statements that "Defendants ... regularly conduct and transact substantial and ongoing business in the State of New York" (FAC ¶ 4) do not suffice to demonstrate minimum contacts with the United States, even under *Fuld*'s "more flexible" standard. *Fuld*, 606 U.S. at 16. Mr. Weinberg further controverts these statements. He states in no uncertain terms that Baller's various agreements were neither negotiated nor executed in New York, and that Mr. Yavin's token compensation was not purchased in New York. (*See* Weinberg Decl. ¶ 15). Plaintiffs may ultimately be able to demonstrate minimum contacts between Baller and some jurisdiction within the United States, but such contacts are not readily apparent from the FAC.

Ultimately, however, these deficiencies are academic, since Baller has waived personal jurisdiction in New York by agreeing to the Second Advisor Agreement. "Unlike subject matter jurisdiction, 'the requirement of personal jurisdiction represents ... an individual right, and therefore it can, like other such rights, be waived.'" *Brown*, 814 F.3d at 625 (alterations adopted) (quoting *Ins. Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). One way a defendant can waive the personal jurisdiction requirement is by consenting "through forum-selection clauses in contractual agreements." *D.H. Blair & Co., Inc.*, 462 F.3d at 103; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* v. *Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38, 48 (S.D.N.Y. 2020) ("Where an agreement contains a valid and enforceable forum selection clause, it is not necessary to analyze jurisdiction under New

York's long-arm statute or federal constitutional requirements of due process." (internal quotation marks and citation omitted and alteration adopted)). Thus, the key issue is whether the forum selection clause at issue is enforceable.

The Second Circuit has established a four-part test to determine the enforceability of a forum selection clause, which considers: (i) whether "the clause was reasonably communicated to the party resisting enforcement"; (ii) whether the clause is "mandatory ... *i.e.*, ... the parties are required to bring any dispute to the designated forum [as opposed to] simply permitted to do so"; (iii) whether "the claims and parties involved in the suit are subject to the forum selection clause"; and (iv) if the first three inquiries are satisfied and the forum selection clause is "presumptively enforceable," whether the defendant "has rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Phillips* v. *Audio Active Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007) (emphasis omitted) (internal quotation marks omitted) (quoting *M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)); *accord Fasano* v. *Yu Yu ("Fasano II")*, 921 F.3d 333, 335 (2d Cir. 2019).[5]

---

5 The Court notes that the Second Advisor Agreement also contains a New York choice-of-law clause. (*See* Ex. K at 5 ("This Agreement will be governed by and construed in accordance with the laws of the State of New York, excluding its body of law controlling conflict of laws.")). The Second Circuit has instructed that "where a contract contains both a valid choice-of-law clause and a forum selection clause, the substantive law identified in the choice-of-law clause governs the *interpretation* of the forum selection clause, while federal law governs the *enforceability* of the forum selection clause." *Martinez* v. *Bloomberg LP*, 740 F.3d 211, 214 (2d Cir. 2014) (emphases added). *Martinez* expanded upon the practical implications of this holding:

Plaintiffs argue that the Court has personal jurisdiction over Baller because Baller contractually consented to such jurisdiction through the forum selection clause in the parties' Second Advisor Agreement. (FAC ¶ 4; Pl. Opp. 19-20, 22). The Court agrees. Beginning with the first prong of the *Phillips* analysis, the Second Advisor Agreement's forum selection clause was "reasonably communicated" to Baller. *See Phillips*, 494 F.3d at 383. In the body of the Second Advisor Agreement, the "Governing Law" section provides as follows:

> This Agreement will be governed by and construed in accordance with the laws of the State of New York, excluding its body of law controlling conflict of laws. Any legal action or proceeding arising under this Agreement will be brought exclusively in the federal or state courts located in the District of New York and the parties irrevocably consent to the personal jurisdiction and venue therein.

(Ex. K at 5). The clause unambiguously provides "irrevocabl[e] consent to the personal jurisdiction" of "the federal or state courts located in the District of New York." (*Id.*). *See Rabinowitz* v. *Kelman*, 75 F.4th 73, 83 (2d Cir. 2023) ("[T]hat the parties 'submit themselves to the personal jurisdiction' of certain

---

> The overriding framework [i.e., the four-part test] governing the effect of forum selection clauses in federal courts ... is drawn from federal law. Furthermore, federal law should be used to determine whether an otherwise mandatory and applicable forum clause is *enforceable* ... i.e., step four in [the four-part] analysis. ... In answering the *interpretive* questions posed by parts two and three of the four-part framework, however, [courts] normally [should] apply the body of law selected in an otherwise valid choice-of-law clause.

*Id.* at 217-18 (internal quotation marks and citations omitted). The Court's analysis herein accords with these directions; that is, the Court applies New York law as to steps two and three of the four-part analysis.

court ... operates simply as mutual consent to personal jurisdiction in those courts" (emphasis omitted)); *see also Speedfit LLC* v. *Woodway USA, Inc.*, 642 F. Supp. 3d 429, 444 (S.D.N.Y. 2022) ("A forum selection clause may be deemed reasonably communicated where the clause at issue appears as a standard section in the main body of an agreement signed by the parties and is phrased in both clear and unambiguous language." (internal quotation marks omitted and alterations adopted)). Although Baller's director, OtoCorp, technically "DocuSigned" on its behalf, the agreement was explicitly "entered into" by "Baller." (Ex. K at 1; FAC ¶¶ 33-35). Thus, the forum selection clause was clearly communicated to Baller.

Moving to the second prong, the forum selection clause is undeniably "mandatory." *See Phillips*, 494 F.3d at 383. As an initial matter, the Governing Law section of the Second Advisor Agreement designates New York as the choice of law. (*See* Ex. K at 5 ("This Agreement will be governed by and construed in accordance with the laws of the State of New York.")). Applying New York principles of contractual interpretation, the forum selection clause manifests a clear "intent to make [New York] jurisdiction exclusive" by stating that "[a]ny legal action or proceeding arising under this Agreement *will* be brought *exclusively* in ... New York." (Ex. K at 5 (emphasis added)). *See Fear & Fear, Inc.* v. *N.I.I. Brokerage, L.L.C.*, 851 N.Y.S.2d 311, 313 (4th Dep't 2008); *see also, e.g.*, *Sadiant, Inc.* v. *Penstock Consulting, LLC*, No. 23 Civ. 7872 (KPF), 2024 WL 2847195, at *8 (S.D.N.Y. May 30, 2024) (concluding that a clause reciting that New York courts "shall have exclusive jurisdiction" was mandatory

under New York law). The mandatory force of the words "will be brought" is distinct from a permissive contract in which disputes "may be brought." *See Phillips*, 494 F.3d at 386-87 (quoting *Blanco* v. *Banco Indus. de Venez., S.A.*, 997 F.2d 974, 976, 979 (2d Cir. 1993)). Moreover, the clause specifically states that "the parties irrevocably consent to the personal jurisdiction and venue therein." (Ex. K at 5). New York courts have "repeatedly" found that even facially permissive forum selection clauses become mandatory "when combined with other language of exclusivity in the contractual provisions, such as a waiver of venue and forum objections by the parties." *Flextronics Da Amazonia Ltda.* v. *CRW Plastics USA, Inc.*, No. 22-2803-cv, 2023 WL 8270818, at *3 (2d Cir. Nov. 30, 2023) (summary order) (collecting cases).

Under prong three, the Court finds that the federal securities claim falls within the scope of the forum selection clause. *See Phillips*, 494 F.3d at 383. To be subject to the forum selection clause, "[*a*]*ny* legal action or proceeding" must "*aris*[*e*] *under* this Agreement." (Ex. K at 5 (emphases added)). Baller does not dispute that New York contract law permits a securities fraud claim to "arise under" this type of employee compensation agreement.[6] Instead, Baller

[6] Baller does not contest — and the Court therefore does not consider — whether the language "arising under" is too narrow to encompass a federal securities claim. As a reminder, the Second Advisor Agreement covers "[a]ny legal action or proceeding arising under this Agreement. (Ex. K at 5). While "[*a*]*ny* legal action or proceeding" sweeps broadly, "arising under" arguably narrows the scope of potential claims bound by the forum selection clause. *See Phillips* v. *Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) (noting that "arising in relation to" is arguably broader than "arising under" (quoting *John Wyeth & Brother Ltd.* v. *CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (Alito, J.))). But even under a narrow construction, the forum selection clause would likely still be enforceable. This case is somewhat unusual because Plaintiffs allege that the Second Advisor Agreement containing the forum selection clause is itself the "investment contract" underlying the fraud. By this logic, the suit "arises under"

argues that Plaintiffs have "not identif[ied] which [state and federal] claims arise under which agreement." (Def. Br. 19).

Baller points to the California forum selection clause in the First Advisor Agreement (Ex. J at 5), and the British Virgin Islands forum selection clause in the SAFT (Ex. B at 11), to argue that Plaintiffs "plead[ ] claims interchangeably across three separate agreements with conflicting mandatory forums" and have not specifically tied the securities claim to the Second Advisor Agreement. (*See* Def. Br. 19). This argument is unavailing. Assuming that the Second Advisor Agreement is an "investment contract," then the agreement itself is tied to alleged misrepresentations and omissions that induced Mr. Yavin to accept potentially worthless Beast Coin as compensation. (FAC ¶¶ 191-197). To be sure, Plaintiffs often paint with too broad a brush when elaborating on their theory of this case, and it is not entirely clear which state-law claims are linked to which forum selection clauses. (*See id.* ¶ 4; Pl. Opp. 21-22). But focusing solely on the federal securities claim, Plaintiffs have adequately demonstrated that the claim arises under (and thus falls within the scope of) the Second Advisor Agreement.

The first three requirements of the *Phillips* test are met. Accordingly, the forum selection clause is presumptively enforceable, and Baller has made no argument to rebut this presumption. *Cf. Scherk* v. *Alberto-Culver Co.*, 417 U.S. 506, 519 n.14 (1974) (concluding that a forum selection clause is "not

---

the Second Advisor Agreement in the most literal sense: The fraud was perpetrated through the agreement itself.

enforceable if the inclusion of that clause in the contract was the product of fraud or coercion"). This is not one of those "rare case[s]" where "a court may decline to enforce a forum selection clause" because "the resisting party satisfies the heavy burden of showing that 'it would be unfair, unjust, or unreasonable to hold that party to his bargain.'" *Rabinowitz*, 75 F.4th at 81 (quoting *M/S Bremen*, 407 U.S. at 18). Thus, the Court finds that the Second Advisor Agreement's forum selection clause is enforceable against Baller, and Baller has consented to jurisdiction.

### B. The Court Dismisses Plaintiffs' Claims Against Astronomica on *Forum Non Conveniens* Grounds

Defendants separately challenge the propriety of Plaintiffs bringing claims against them in this District. Although Defendants nominally frame their arguments under Rule 12(b)(3) as a motion to dismiss for improper venue, they largely dispute the enforceability of the forum selection clause in the Second Advisor Agreement. (Def. Br. 20-21; Def. Reply 8). Significantly, however, "the appropriate way to enforce a forum-selection clause … is through the doctrine of *forum non conveniens*, rather than Rule 12(b). *Rabinowitz*, 75 F.4th at 80 (internal quotation marks omitted) (quoting *Martinez* v. *Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014)); *see also id.* at 81 (explaining that "dismissal based on a forum-selection clause is nothing more than a species in the broader genus of *forum non conveniens* matters").[7] Viewing Plaintiffs'

---

[7] Arguably, venue is not "proper" for this claim in the Southern District of New York. Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa(a), contains a special venue provision that provides venue in any district where the defendant lives or transacts business, or where "any act or transaction constituting the violation occurred." Where

claims through that lens, the Court concludes that the forum selection clause in the Second Advisor Agreement is enforceable against Baller and Mr. Weinberg, but not against Astronomica.

### 1. Applicable Law

"The doctrine of *forum non conveniens* is 'a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim.'" *Carey* v. *Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (quoting *Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000)). The rationale for dismissing a case on *forum non conveniens* grounds is that "a court abroad is the more appropriate and convenient forum for adjudicating the controversy." *Sinochem Int'l Co.* v. *Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).

---

a violation consists of a defendant's fraudulent representations, "misrepresentations … are deemed to 'occur' in the district where [they] are issued or the truth is withheld[.]" *In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392, 397 (S.D.N.Y. 2006) (internal quotation marks and citation omitted). "[A]ny non-trivial act in the forum district which helps to accomplish a securities law violation is sufficient to establish venue." *SEC* v. *Rust*, No. 16 Civ. 3573 (ER), 2017 WL 239381, at *1 (S.D.N.Y. Jan. 17, 2017) (internal quotation marks and citation omitted). Yet, here, the only uncontroverted New York-based fact is that the Second Advisor Agreement designated New York as the forum of choice in the Second Advisor Agreement. (Ex. K at 5). Defendants dispute in a sworn declaration whether any parties are domiciled in New York, any relevant contracts were negotiated or signed in New York, any business was directed at New York, and any crypto tokens were funneled through New York. (Mr. Weinberg Decl. ¶¶ 3-6, 12-21).

Nonetheless, the Court will not reach this issue because it has not been properly briefed. *See Clark* v. *Sweeney*, 607 U.S. 7, 10 (2025) (reversing the Fourth Circuit for "depart[ing] so drastically from the principle of party presentation" by "radical[ly] transform[ing]" the defendant's "simple ineffective-assistance claim" (quoting *Sineneng-Smith*, 590 U.S. 371, 375, 380 (2020))); *see also Acosta* v. *Artuz*, 221 F.3d 117, 122 (2d Cir. 2000) ("Generally, courts should not raise *sua sponte* nonjurisdictional defenses not raised by the parties." (internal quotation marks and citation omitted)).

In general, when determining whether to dismiss a matter on *forum non conveniens* grounds, a district court must assess "[i] the deference to be accorded the plaintiff's choice of forum; [ii] the adequacy of the alternative forum proposed by the defendants; and [iii] the balance between the private and public interests implicated in the choice of forum." *Fasano II*, 921 F.3d at 335 (citing *Norex Petroleum Ltd.* v. *Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005)). Unless it would be unnecessarily burdensome for the defendant or the court, "the plaintiff's choice of forum should rarely be disturbed." *Iragorri* v. *United Techs. Corp.*, 274 F.3d 65, 70-71 (2d Cir. 2001) (en banc) (quoting *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508 (1947)). The decision to dismiss a case on general *forum non conveniens* grounds "lies wholly within the broad discretion of the [d]istrict [c]ourt." *Aenergy, S.A.* v. *Republic of Angola*, 31 F.4th 119, 128 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Iragorri*, 274 F.3d at 72). When ruling on motions to dismiss for *forum non conveniens*, courts may consider and credit any evidence in the record, including affidavits. *See Alcoa S.S. Co.* v. *M/V Nordic Regent*, 654 F.2d 147, 158-59 (2d Cir. 1980) (en banc); *see also Koster* v. *(Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 531 (1947).

"Where the parties have contractually selected a forum, however, the forum selection clause substantially modifies the *forum non conveniens* doctrine." *Rabinowitz*, 75 F.4th at 81 (internal quotation marks omitted) (quoting *Fasano II*, 921 F.3d at 335). The "usual tilt in favor of the plaintiff's choice of forum gives way to a presumption in favor of the contractually

selected forum." *Martinez*, 740 F.3d at 218 (citing *M/S Bremen*, 407 U.S. at 6, 15). The Second Circuit employs the same four-part *Phillips* test, discussed above, to determine "whether to dismiss a claim based on a forum selection clause under the modified doctrine of *forum non conveniens*." *Rabinowitz*, 75 F.4th at 81 (citing *Fasano II*, 921 F.3d at 335-36). A forum selection clause is "presumptively enforceable" if: (i) "the clause was reasonably communicated to the party resisting enforcement;" (ii) "the clause is mandatory;" and (iii) "the claims and parties involved in the suit are subject to the forum selection clause." *Martinez*, 740 F.3d at 217 (internal quotation marks omitted) (quoting *Phillips*, 494 F.3d at 383). If those requirements are met, then at the fourth step, a "party can overcome this presumption [of enforceability] only by ... 'making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.* (quoting *Phillips*, 494 F.3d at 383-84). This is a "heavy burden." *Rabinowitz*, 75 F.4th at 81. A showing of "mere inconvenience to parties or witnesses" is not enough to overcome "a presumptively valid forum selection." *Fasano* v. *Li ("Fasano IV")*, 47 F.4th 91, 101 (2d Cir. 2022) (quoting *Atl. Marine Constr. Co.* v. *U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013)).

### 2. Analysis

#### a. The Forum Selection Clause Is Enforceable Against Defendant Baller

The Court has already established that the New York forum selection clause in the Second Advisor Agreement is enforceable against Baller. *See*

*supra* Section A.2.b. The forum selection clause (i) was "reasonably communicated to Baller"; (ii) is couched in "mandatory" language; (iii) covers a federal securities claim arising under the agreement; and (iv) is not alleged to be unjust or a byproduct of fraud. *See Martinez*, 740 F.3d at 217 (quoting *Phillips*, 494 F.3d at 383). The Court finds that Baller has "waive[d] the right to challenge the preselected forum as inconvenient or less convenient" by signing the Second Advisor Agreement. *Fasano IV*, 47 F.4th at 101 (emphasis omitted) (quoting *Atl. Marine Constr. Co.*, 571 U.S. at 64).

#### b. The Forum Selection Clause Is Enforceable Against Mr. Weinberg, But Not Astronomica

The closer question is whether the forum selection clause is enforceable against both Mr. Weinberg and Astronomica, even though neither signed the Second Advisor Agreement. Defendants argue that the Second Advisor Agreement cannot be used as a basis to haul objecting non-signatories like Mr. Weinberg and Astronomica into the forum. (Def. Br. 19). This is not strictly correct. "[A]n entity need not have been a signatory to the contract to be covered by a forum selection clause." *Fasano IV*, 47 F.4th at 103; *see also Aguas Lenders Recovery Grp.* v. *Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009) ("[T]he fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause."). Though the Second Circuit has not adopted a standard "governing precisely when a signatory may enforce a forum selection clause against a non-signatory," it has "permitted non-signatories ... to be bound by, and to enforce, forum selection clauses where, under the circumstances, the non-signatories enjoyed a

sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that they would be bound." *Fasano IV*, 47 F.4th at 103 (citing *Aguas Lenders*, 585 F.3d at 701); *see also Magi XXI, Inc.* v. *Stato della Città del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013) (holding that a non-signatory may enforce a forum selection clause against a signatory where the non-signatory is "closely related" to a signatory).

The Second Circuit has identified "several circumstances that could trigger such a result," including where non-signatories were "closely related" to the signatory; where non-signatories had financial interests in the litigation that were "directly related to, if not predicated upon" those of the signatories; and where non-signatories were "integrally related" to the signatories such that the suit should be kept in a single forum. *Fasano IV*, 47 F.4th at 103 (emphases omitted) (internal quotation marks and citations omitted) (quoting *Aguas Lenders*, 585 F.3d at 701). Courts in this District have also found the requisite relationship where the non-signatory played "an active role in the transaction between the signatories[,] … had an active role in the company that was the signatory," *Lavazza Premium Coffees Corp.* v. *Prime Line Distributors Inc.*, 575 F. Supp. 3d 445, 460 (S.D.N.Y. 2021) (internal quotation marks omitted) (quoting *Affiliated FM Ins. Co.* v. *Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329, 336 (S.D.N.Y. 2018)), or were "alter egos, corporate executive officers, and successors-in-interest" of the signatory, *id.* (internal quotation marks omitted) (quoting *Vuzix Corp.* v. *Pearson*, No. 19 Civ. 689 (NRB), 2019 WL 5865342, at *5 (S.D.N.Y. Nov. 6, 2019)).

Here, Plaintiffs seek to enforce the New York forum selection clause against the objecting non-signatories, Mr. Weinberg and Astronomica. Starting with Mr. Weinberg, the Court finds that it would have been "reasonably foreseeable" that he would be bound by the forum selection clause. *See Fasano IV*, 47 F.4th at 104. Mr. Weinberg served as Baller's principal and CEO. (FAC ¶ 19). *See Lavazza Premium Coffees Corp.*, 575 F. Supp. 3d at 460 (describing "corporate executive officers" as "closely related" (internal quotation marks and citation omitted)). By virtue of his position, Mr. Weinberg played a key role in negotiating and drafting the Second Advisor Agreement. (FAC ¶¶ 74-76). In fact, while exchanging drafts of the agreement, Mr. Weinberg allegedly "caught" that California was "mistake[nly]" listed as the proper forum, "confirmed [Mr.] Yavin's openness to New York jurisdiction," and "fixed the error … [by] lay[ing] jurisdiction and venue in New York." (*Id.* ¶¶ 75-76). Mr. Weinberg's "active role" in drafting the forum selection clause and "in the company" more generally suffices to establish a "close" relationship with Baller. *See Lavazza Premium Coffees Corp.*, 575 F. Supp. 3d at 460 (internal quotation marks and citation omitted).

The same is not true of Astronomica. Both Baller and Astronomica were involved in Beast League, albeit to varying degrees. While Baller spearheaded the launch and signed the relevant contractor and investor agreements (FAC ¶ 40; Ex. B, J, K), Astronomica, and its affiliate Acid Labs, played a peripheral role, limited to filing for the "BEAST LEAGUE" trademark in May 2023 (FAC ¶ 42; Ex. E at 1), and owning the website domain as early as March

2024 (FAC ¶ 43; Ex. F at 2, 9). Crucially, Astronomica took no part in negotiating or executing the Second Advisor Agreement on April 11, 2024. (FAC ¶ 77; Ex. K at 1; Weinberg Decl. ¶ 30). Mr. Yavin concedes that, at the time of signing, he was not personally aware that Astronomica had any role in developing Beast League. (FAC ¶¶ 32, 67). If Mr. Yavin were unaware of Astronomica's purported connection to the Second Advisor Agreement, it would have hardly been "reasonably foreseeable" to Astronomica that it was bound by that agreement. Arguably, any benefit Baller gained from Mr. Yavin's advisory work on Beast League could flow to Astronomica, which had a marginal interest in Beast League's success. But Astronomica is by no means a formal "successor in interest" or true third-party beneficiary that is "integral to the obligations of the overall contract." *Aguas Lenders*, 585 F.3d at 701.

Plaintiffs argue that Mr. Weinberg's role as principal of both Astronomica and Baller shows that the entities are "closely related." (FAC ¶¶ 19, 48). Nonetheless, sharing a corporate principal alone is not enough to make a forum selection clause reasonably foreseeable to a non-signatory entity. *Cf. Trodale Holdings LLC* v. *Bristol Healthcare Invs., L.P.*, No. 16 Civ. 4254 (KPF), 2017 WL 5905574, at *6-7 (S.D.N.Y. Nov. 29, 2017) (holding that a forum selection clause was not "reasonably" foreseeable to a non-signatory corporate entity even though the individual who controlled that entity signed the agreement on behalf of a different entity). In *Fasano IV*, the Second Circuit observed in *dicta* that two entities "fit neatly into the … parade of non-signatories bound by a forum selection clause," given that they "were wholly

owned and 60% owned by" a shareholder who was also the "largest stockholder" of a signatory entity. 47 F.4th at 103-04. But the Court ultimately found that the non-signatories were bound because they were named in the "Buyer Group" of the underlying deposit agreement, which repeatedly stated that they would be "SUBJECT TO THE TERMS AND CONDITIONS[.]" *Id.* at 104. Here, the FAC alleges no facts about Mr. Weinberg's equity holdings in Baller or Astronomica. And unlike in *Fasano IV*, Astronomica is not named in the Second Advisor Agreement and has not consented to its terms. Thus, Astronomica does not "enjoy[ ] a sufficiently close nexus to the dispute or to another signatory such that it was foreseeable that [it] would be bound." *Id.* at 103.

In the alternative, Plaintiffs allege that Baller and Astronomica are "alter egos" of one another, so both are bound by the forum selection clause. (Pl. Opp. 20-21). "Under New York contract law, it is axiomatic that a contract cannot bind a non-party unless the contract was signed by the party's agent, the contract was assigned to the party, or the signatory is in fact the alter ego of the party." *Caplan*, 803 F. Supp. 3d at 230 (internal quotation marks omitted) (quoting *Arcadia Biosciences, Inc.* v. *Vilmorin & Cie*, 356 F. Supp. 3d 379, 390 (S.D.N.Y. 2019)). More specifically, courts have found that "a forum selection clause may be enforced against a [signatory] company's alter ego." *Platina Bulk Carriers Pte Ltd.* v. *Praxis Energy Agents DMCC*, No. 20 Civ. 4892 (NRB), 2021 WL 4137528, at *4 (S.D.N.Y. Sept. 10, 2021).

In applying the alter ego analysis, however, "'[i]t is well settled that … courts are reluctant to disregard the corporate entity.'" *Liberty Highrise Pvt. Ltd.* v. *Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 570 (S.D.N.Y. 2022) (quoting *William Wrigley Jr. Co.* v. *Waters*, 890 F.2d 594, 600 (2d Cir. 1989)). Pursuant to New York law, a court may "pierce the corporate veil" only where (i) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and (ii) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Lakah* v. *UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014) (internal quotation marks omitted) (quoting *MAG Portfolio Consult, GMBH* v. *Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001)).

The FAC does not sufficiently allege that Baller and Astronomica are alter egos of each other under New York law. The entities supposedly shared Mr. Weinberg as a principal, and various other "common directors and officers" (FAC ¶ 48) — but how Baller can have multiple "directors" while officially listing only one, Otonom Ltd., defies logic (*id.* ¶ 34 ("the sole director of Baller is Otonom Ltd"); Ex. D at 1). Further, courts have "routinely" held such allegations to be insufficient on their own to establish an alter ego. *See, e.g.*, *Caplan*, 803 F. Supp. 3d at 232 (rejecting alter ego theory of personal jurisdiction where the non-signatory defendants shared "officers and directors" and "office spaces (one being [the signatory defendant's] residence, no less)"); *see also, e.g.*, *Vibes Int'l Inc., SAL* v. *Iconix Brand Grp., Inc.*, No. 18 Civ. 11449 (JGK), 2020 WL 3051768, at *8 (S.D.N.Y. June 8, 2020) (rejecting alter ego

theory based on "[a]llegations of complete ownership, common officers and personnel, and shared office space … without more"); *Parsons* v. *Kal Kan Food, Inc.*, 892 N.Y.S.2d 246, 248 (3rd Dep't 2009) (rejecting an alter ego theory of personal jurisdiction where two companies shared "officers and directors," "an address and phone number," and "the same Web site and promotional brochure").

What is more, Plaintiffs' assertions about Baller's and Astronomica's "fail[ures] to observe corporate formalities," "commingling [of] funds," and operation as "mere facades and alter-egos of one another" are far too generalized and conclusory to suffice. (FAC ¶¶ 36, 48). *See A.V.E.L.A., Inc.* v. *Est. of Monroe*, 34 F. Supp. 3d 311, 320 (S.D.N.Y. 2014) ("[P]urely conclusory allegations are insufficient to state a claim for alter-ego liability." (internal quotation marks and citation omitted)); *see also Koh* v. *Koo*, No. 22 Civ. 6639 (JMF), 2023 WL 5352786, at *3 (S.D.N.Y. Aug. 21, 2023) ("[The plaintiff's] repeated assertions that [the defendant] exercised complete domination and control are plainly insufficient on their own." (internal quotation marks omitted)). For example, the FAC alleges "[o]n information and belief," that "Baller and Weinberg transferred numerous assets, including some or all of the Fund['s investment], from Baller to Astronomica." (FAC ¶ 59). However, the FAC does not specify how much money was transferred, when or how often the transfers occurred, or the terms of the transfers. This is plainly defective. *See Giuliano* v. *Barch*, No. 16 Civ. 859 (NSR), 2017 WL 1234042, at *12 (S.D.N.Y. Mar. 31, 2017) (conclusory allegations or those "made on information and

belief" that defendants "exercised complete domination and control" over a company failed to establish alter ego jurisdiction); *see also, e.g.*, *Long Side Ventures LLC* v. *Hempacco Co.*, No. 22 Civ. 8152 (ALC), 2023 WL 6386888, at *7 (S.D.N.Y. Sept. 29, 2023) (finding an allegation conclusory where "Plaintiffs d[id] not detail how Defendants cooperated to transfer assets fraudulently, or why their only intent was to render [the alleged alter ego] 'judgment-proof'"). Accordingly, Plaintiffs' reliance on an alter ego theory to enforce the forum selection clause against Astronomica fails. The Court dismisses the federal securities claim against Astronomica on *forum non conveniens* grounds.

### C. Plaintiffs Fail to State a Claim Under Section 10(b) and Rule 10b-5

#### 1. Applicable Law

Having addressed Defendants' jurisdictional and venue challenges, the Court proceeds to consider the adequacy of Plaintiffs' pleadings against the two remaining Defendants. When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [a] [p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). While the plausibility requirement "is not akin to a 'probability requirement' ... it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)). As relevant here, "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *See Employees' Ret. Sys. of Gov't of the Virgin Islands* v. *Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (quoting *ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)); *see also ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States* ex rel. *Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). Beyond this narrow universe of materials, a court may also consider "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and disregard "allegations in a complaint

that contradict or are inconsistent with judicially-noticed facts." *Becker* v. *Cephalon, Inc.*, No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks and citations omitted).

**2. Analysis**

**a. Mr. Yavin Has Standing**

Plaintiffs' securities claim rests on the assumption that the Second Advisor Agreement constitutes an "investment contract" under the *Howey* test "because it was an agreement to acquire Beast Coins in exchange for Yavin's rendering of services pursuant to its terms." (FAC ¶¶ 184-185; Pl. Opp. 7-14).[8] Reasoning from this premise, Plaintiffs argue that Defendants misrepresented their intent to abandon Beast League in favor of Boinkers, thereby rendering Plaintiffs' Beast Coin compensation worthless. (FAC ¶¶ 192-197; Pl. Opp. 14-18). For their part, Defendants oppose the characterization of the Second Advisor Agreement as an investment contract, the domestic nature of the transaction at issue, the timeliness of the claim, and the adequacy of Plaintiffs' pleadings. (Def. Br. 5-17; Def. Reply 3-5).

Separately, Defendants contend that Plaintiffs lack standing because they did not "sell or purchase" securities under *Blue Chip Stamps* v. *Manor*

---

[8] In their opposition, Plaintiffs reframe the key question in the *Howey* test as "whether Beast Coin" — not the Second Advisor Agreement — "is an investment contract." (Pl. Opp. 8; *see also, e.g.*, *id.* at 11 ("Defendants themselves supply facts plausibly supporting that Beast Coin is a security.")). However, "[i]t is well established in this [D]istrict that a plaintiff cannot amend his pleadings in his opposition briefs." *Essilor Int'l SAS* v. *J.P. Morgan Chase Bank, N.A.*, 650 F. Supp. 3d 62, 86 (S.D.N.Y. 2023) (internal quotation marks and citation omitted); *see also Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (same). The Court will follow that rule here and not credit Plaintiffs' alternative theory of Beast Coin as the alleged investment contract.

*Drug Stores*. 421 U.S. 723, 749-55 (1975). (Def. Br. 30-31; Def. Reply 3-4). In their estimation, Mr. Yavin received — rather than purchased — Beast Coin in exchange for his advisory services, which Defendants frame as different in kind than being a "purchaser" of securities. (Def. Br. 30-31; Def. Reply 3-4). Further, Defendants argue that the Entity Plaintiffs lack standing to sue because they are neither parties to nor beneficiaries of the Second Advisor Agreement. (*Id.*). The Court holds that Mr. Yavin has standing under the *Blue Chip Stamps* standard, but that the Entity Plaintiffs do not.

#### i. Mr. Yavin Has Standing Under the Purchaser-Seller Rule

The Court takes Defendants' arguments in reverse order. Section 10(b) of the Exchange Act and Rule 10b-5 do not provide an express private right of action, but "the Supreme Court has long held that one is implied." *Menora Mivtachim Ins. Ltd.* v. *Frutarom Indus. Ltd.*, 54 F.4th 82, 85 (2d Cir. 2022). In *Blue Chip Stamps*, the Supreme Court adopted the purchase-seller rule from *Birnbaum* v. *Newport Steel Corp.* to limit who can sue under Section 10(b) and Rule 10b-5. *Blue Chip Stamps*, 421 U.S. at 730-31 (citing *Birnbaum*, 193 F.2d 461, 463-64 (2d Cir. 1952)). Only actual purchasers or sellers of a security have standing to assert claims under Section 10(b) and Rule 10b-5. *See id.*

Assuming *arguendo* the Second Advisor Agreement is an investment contract — which the Court chooses to do, rather than wade into the *Howey* quagmire — the relevant question is whether Mr. Yavin's Beast Coin compensation agreement renders him a "purchaser or seller of securities." The Court holds that it does. It is well established under Second Circuit case law

that "[e]mployment contracts promising shares as compensation are generally considered securities transactions within Rule 10b-5." *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). That is the case "even if the contract [wa]s never fully performed" or the stock was not actually sold. *Yoder* v. *Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 559 (2d Cir. 1985) (holding that stock offered as an inducement to accept employment qualifies as a purchase or sale of securities under the Exchange Act).

Considered in the cryptocurrency context, receiving crypto tokens in exchange for advisory services bears the hallmarks of classic bargained-for consideration because both sides are trading something of economic value. *See In re Tomahawk Exploration LLC*, Securities Act Release No. 10530, Exchange Act Release No. 83839, Admin. Proc. File No. 3-18641, at 2 (Aug. 14, 2018) (holding that the company's "issuance of tokens ... constituted an offer and sale of securities" because the company provided the tokens "to investors in exchange for services designed to advance [the company's] economic interests and foster a trading market for its securities"). Here, Mr. Yavin received a crypto token as an investment opportunity, and Baller received advice intended to enhance that token's development and value. This arrangement is distinct from being gifted — or "airdropped" — crypto tokens for no or nominal consideration. *See Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets*, 91 Fed. Reg. 13714, 13730-31 (Mar. 23, 2026) (Release No. 33-11412) (discussing how "airdrops of non-security crypto assets to recipients who do

not provide the issuer with money, goods, services, or other consideration in exchange for the airdropped non-security crypto asset" should not be considered an "investment of money" under the *Howey* test). The FAC does not specify several of the key details of the Beast Coin compensation agreement, such as when Beast Coin was distributed to Mr. Yavin, when the compensation fully vested, and where the transactions were ultimately executed. But by alleging a classic bargained-for consideration transaction, the FAC plausibly pleads that Mr. Yavin was a purchaser of securities, and thus has standing under *Blue Chip Stamps*.

**ii. The Entity Plaintiffs Do Not Have Standing**

The Entity Plaintiffs are a different matter. As discussed, *Blue Chip Stamps* "strictly limited standing to bring suit under [Section] 10(b) to actual purchasers and sellers of a security and those plaintiffs with a contractual right to purchase or sell a security." *Lawrence* v. *Cohn*, 325 F.3d 141, 152 (2d Cir. 2003) (citing *Blue Chip Stamps*, 421 U.S. at 737, 750-51). "Section 10(b) standing does not depend on the significance or directness of the relationship between two companies." *Menora Mivtachim*, 54 F.4th at 88. The purchaser-seller rule has a narrow carveout for a trust beneficiary, who may sue as the only party "actually harmed by the securities transaction in question and [i]s thus a de facto buyer." *Gross* v. *Diversified Mortg. Invs.*, 431 F. Supp. 1080, 1093 (S.D.N.Y. 1977), *aff'd sub nom. Michael C. Duban* v. *Diversified Mortg. Invs.*, 636 F.2d 1201 (2d Cir. 1980); *see also Great W. Ins. Co.* v. *Graham*, No. 18 Civ. 6249 (LTS), 2026 WL 34966, at *9 n.7 (S.D.N.Y. Jan. 6, 2026)

(noting that *Menora* "does not address or undermine the trust beneficiary exception to the purchaser-seller rule").

Here, the Entity Plaintiffs are not "actual purchasers" of a security. *See Lawrence*, 325 F.3d at 152. They were not parties to the Second Advisor Agreement, did not participate in the underlying negotiations, and did not receive any Beast Coin. Moreover, and despite Plaintiffs' arguments to the contrary, the FAC does not plead that the Entity Plaintiffs are trust or intended beneficiaries of the Second Advisor Agreement that could step into Mr. Yavin's shoes to assume standing. (Pl. Opp. 24-26). Fundamentally, the Entity Plaintiffs have a separate legal existence that cannot be conflated with corporate principals like Mr. Yavin. Because non-purchasers and non-sellers have no private right of action, the Entity Plaintiffs may not proceed with their securities claim against Defendants.

**b. The Securities Claim Is Impermissibly Extraterritorial**

Next, the parties dispute whether applying domestic federal securities law to Plaintiffs' claim would be impermissibly extraterritorial. "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison*, 561 U.S. at 255. Based on this presumption against extraterritoriality, the Supreme Court held in *Morrison* that Section 10(b) of the Exchange Act extended only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." 561 U.S. at 267; *see also id.* at 268 (noting that "[t]he same focus

on domestic transactions is evident in the Securities Act [of 1933]"); *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017) (applying the same to the Securities Act).

In so holding, *Morrison* established a two-pronged "transactional test" to determine whether claims are sufficiently domestic. To satisfy the first prong, the transaction must involve "securities listed on domestic exchanges." *Morrison*, 561 U.S. at 267. For "transactions involving securities that are not traded on a domestic exchange," the transaction is sufficiently domestic only "if irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). This determination, although "a merits question," is "properly ... considered on a motion to dismiss under Rule 12(b)(6)." *Fleming Intermediate Holdings LLC* v. *James River Grp. Holdings, Ltd.*, No. 24 Civ. 5335 (JLR), 2025 WL 1993478, at *11 (S.D.N.Y. July 17, 2025) (internal quotation marks and citation omitted), *reconsideration denied*, No. 24 Civ. 5335 (JLR), 2025 WL 3459348 (S.D.N.Y. Dec. 2, 2025); *see also Cavello Bay Reins. Ltd.* v. *Stein*, 986 F.3d 161, 163-64 (2d Cir. 2021) (affirming Rule 12(b)(6) dismissal based on extraterritoriality grounds).

As for the second prong, the Second Circuit has since clarified that while a "domestic securities transaction (or transaction in a domestically listed security) [is] necessary to a properly domestic invocation of [Section] 10(b), such a transaction is not alone sufficient to state a properly domestic claim under the statute." *Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*,

763 F.3d 198, 215 (2d Cir. 2014) (per curiam). Section 10(b) will still be inapplicable if "the claims in th[e] case are so predominantly foreign as to be impermissibly extraterritorial." *Id.* at 216. Thus, a party alleging a federal securities violation must prove both that (i) the transaction was domestic, *see Absolute Activist*, 677 F.3d at 67, and (ii) the transaction was not "so predominantly foreign," *see Parkcentral*, 763 F.3d at 215. *See Cavello Bay Reins.*, 986 F.3d at 163-64 (adopting this framework).

Assuming once again that the Second Advisor Agreement constitutes a qualifying investment contract, Plaintiffs and Defendants agree that the contract does not involve securities listed on a domestic exchange. (Def. Br. 7; Pl. Opp. 17). Mr. Yavin received a private distribution of Beast Coin in exchange for his advisory services under the Second Advisor Agreement, but Beast Coin is a cryptocurrency token not publicly traded on any U.S. exchange. (Ex. K at A-1-2). Instead, Defendants contest extraterritoriality on two grounds: (i) the transaction under the Second Advisor Agreement was not "domestic" based on where irrevocable liability was incurred or title was transferred, and (ii) even if the transaction was domestic, Plaintiffs' claim is "so predominantly foreign" as to be impermissible. (Def. Br. 6-8). The Court agrees with both lines of argument.

**i. The Transaction Was Not Domestic**

A transaction that does not involve securities listed on a U.S. exchange is domestic only "if irrevocable liability is incurred or title passes within the United States." *Absolute Activist*, 677 F.3d at 67. Defendants contend that

Plaintiffs have failed to allege any facts suggesting that irrevocable liability was incurred or title was transferred within the United States. (Def. Br. 7). Specifically, Defendants argue that Plaintiffs have utterly failed to identify "any U.S. execution, acceptance, delivery, or transfer of any securities" sufficient to establish a domestic transaction. (Def. Reply 4). Plaintiffs disagree, arguing that liability became irrevocable when Baller (a foreign domiciliary) became obligated to deliver Beast Coin (a cryptocurrency token with no physical location) to Mr. Yavin (who is domiciled abroad). (Pl. Opp. 18). Notably, Plaintiffs' entire argument hinges on Baller being "functionally controlled" from California by Astronomica — which has been dismissed from this suit pursuant to its *forum non conveniens* motion. (*Id.*). That single allegation of control cannot bear the full weight of Plaintiffs' arguments.

The domestic nature of a transaction turns on "when and where the transaction became irrevocable" or title was transferred. *Williams* v. *Binance*, 96 F.4th 129, 136 (2d Cir. 2024), *cert. denied sub nom. Binance* v. *Anderson*, 145 S. Ct. 1048 (2025). Irrevocable liability attaches when parties "becom[e] bound to effectuate the transaction or enter[ ] into a binding contract to purchase or sell securities." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 265 (2d Cir. 2016) (internal quotation marks and citation omitted); *Absolute Activist*, 677 F.3d at 67 (explaining that a "domestic transaction" occurs when a purchaser incurs "irrevocable liability" within the United States to take and pay for a security, or a "seller incur[s] irrevocable liability within the United States to deliver a security"). That is to say, a transaction becomes irrevocable

"when the parties to the transaction are committed to one another, or when in the classic contractual sense, there was a meeting of the minds of the parties." *Williams*, 96 F.4th at 136 (internal quotation marks omitted) (quoting *Absolute Activist*, 677 F.3d at 68). Irrevocable liability may attach in "more than one location," and "at more than one time," because "there is always more than one side to any given transaction." *Id.* at 137 (internal quotation marks and citations omitted). Additionally, the "situs of the transaction" is not necessarily "[t]he location or residency of the buyer, seller, or broker." *In re Petrobras Sec.*, 862 F.3d at 262.

Pinpointing the location of irrevocable liability is no simple task. This analysis "is particularly difficult when a transaction takes place over an exchange that claims to have no physical location in any geographic jurisdiction and not be subject to the oversight of any country's regulatory authority." *Williams*, 96 F.4th at 136-37. In *Williams*, U.S. purchasers of seven categories of cryptocurrency tokens bought on Binance alleged that Binance promoted, offered, and sold tokens in violation of the Securities Act and the Exchange Act. *Id.* at 132-33. Binance claimed to have no physical location because all token exchanges took place online, thereby rendering Plaintiffs' claims impermissibly extraterritorial. *Id.* at 136-37. The Second Circuit disagreed, ruling that "Plaintiffs plausibly alleged facts showing that two transactional steps giving rise to an inference of irrevocable liability occurred in the United States." *Id.* at 137.

*First*, the Second Circuit explained that, despite denying having any physical location, Binance "relie[d] on" infrastructure "to operate its exchange," including U.S.-based "computer servers and data centers." *Williams*, 96 F.4th at 138 (internal quotation marks and citations omitted). Even though "it may not always be appropriate to determine where matching occurred solely based on the location of the servers the exchange runs on," the Court found that it was appropriate in that case because "Binance ha[d] not registered in any country, purport[ed] to have no physical or official location whatsoever, and the authorities in Malta, where its nominal headquarters are located, disclaim[ed] responsibility for regulating Binance." *Id.* at 139. As such, Plaintiffs' buy offers with sellers were "matched," and therefore became irrevocable, on Binance's servers located in the United States. *Id.*

*Second*, the Second Circuit held that irrevocable liability also attached "when [Plaintiffs] entered into the Terms of Use with Binance, placed their purchase orders, and sent payments from the United States." *Williams*, 96 F.4th at 139. Because Binance disclaimed any physical location, the Second Circuit had "particular reason to consider" other relevant factors, such as "'facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money' to determine when and where an investor becomes irrevocably bound to complete a transaction." *Id.* at 139-40 (emphasis omitted) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 181 n.33 (2d Cir. 2014)); *see also, e.g.*, *Giunta* v. *Dingman*, 893 F.3d 73, 76-77, 79-80 (2d Cir. 2018) (finding that irrevocable

liability occurred in New York, where the parties met in person, one party received telephone calls from the other while negotiating, they sent the terms of the agreement, and funds were transferred); *Fed. Hous. Fin. Agency* v. *Nomura Holding Am., Inc.*, 873 F.3d 85, 156-58 (2d Cir. 2017) (finding that irrevocable liability occurred in the District of Columbia and Virginia, where employees received offer materials by email); *United States* v. *Vilar*, 729 F.3d 62, 76-78 (2d Cir. 2013) (finding a domestic transaction based on the location where the party executed documents necessary to make an investment and the location from where money was sent).

Here, the Court encounters another "difficult" case. As in *Williams*, the transfer of Beast Coin under the Second Advisor Agreement did not occur on a domestic or registered exchange. The Court presumes that the specific Beast Coins were transferred through "cryptocurrency exchanges" where they were also meant to be traded. (*See* FAC ¶ 26). Plaintiffs argue that "irrevocable liability attached in the [United States] when Baller … became bound to deliver Beast Coins" to them. (Pl. Opp. 18 ("Nothing more is required at this stage.")). But in the absence of a clearly defined locus for Beast Coin transfers, this Court, like the *Williams* Court, "look[s] to 'facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money'" to determine irrevocability. *Williams*, 96 F.4th at 139-40 (quoting *City of Pontiac*, 752 F.3d at 181 n.33).

The transaction centers on the execution of the Second Advisor Agreement. The agreement was "entered into as of 4/9/2024 (the "*Effective*

*Date*"), between Baller …, a British Virgin Island corporation … and … [Mr.] Yavin with a registered address [in] … Tallinn, Estonia." (Ex. K at 1). Although it was "effective" as of April 9, 2024, Mr. Yavin officially "DocuSigned" the agreement on April 9, 2024, and OtoCorp, the "Director" of Baller, DocuSigned on April 11, 2024. (*Id.* at 5, A-2). Normally, under New York contract law, "where parties to an agreement expressly provide that a written contract be entered into 'as of' an earlier date than that on which it was executed, the agreement is effective retroactively 'as of' the earlier date and the parties are bound thereby accordingly." *Peleus Ins. Co.* v. *United Specialty Ins. Co.*, No. 24 Civ. 1398 (KPF), 2026 WL 810247, at *8 (S.D.N.Y. Mar. 23, 2026) (internal quotation marks and citation omitted), *appeal withdrawn*, No. 26-1099, 2026 WL 2138361 (2d Cir. July 17, 2026); *accord McKenzie-Morris* v. *V.P. Recs. Retail Outlet, Inc.*, No. 22 Civ. 1138 (GHW), 2022 WL 18027555, at *9 (S.D.N.Y. Dec. 30, 2022). However, according to the Second Circuit, irrevocable liability attaches "when the parties become bound to effectuate the transaction, that is when the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *Giunta*, 893 F.3d at 79 (internal quotation marks and citation omitted). In other words, irrevocable liability is incurred when the parties obligate themselves to perform, not necessarily when the contract itself is deemed effective.

This Court looks to the three parties explicitly named in the Second Advisor Agreement to determine the situs of irrevocable liability: Mr. Yavin,

OtoCorp, and Baller. *See Giunta*, 893 F.3d at 76-77, 79-80 (looking to the location where parties met, received calls to negotiate, sent the terms of the agreement, and transferred funds); *see also Vilar*, 729 F.3d at 76-78 (looking to the location where the party executed documents necessary to make an investment). Mr. Yavin DocuSigned the agreement on April 9, 2024, seemingly from his "registered address" in Tallinn, Estonia. (Ex. K at 1). Then, OtoCorp DocuSigned the agreement on Baller's behalf on April 11, 2024. (Ex. K at 5, A-2). The FAC supplies no facts whatsoever about where OtoCorp (or its affiliates, Otonom Ltd. and Otonomos) executed the contract, or even where the company is incorporated or conducts business. Plaintiffs attempt to explain that Mr. Weinberg — and, implicitly, *not* OtoCorp — "negotiated and executed" the agreement for Baller "while located in California" (FAC ¶ 72), but this is contradicted by the FAC (*id.* ¶ 35 ("[t]he signatory of [the Second Advisor Agreement] is OtoCorp")), and by the Second Advisor Agreement (Ex. K at 5, A-2 (listing OtoCorp's signature)).

By virtue of OtoCorp's signature, Baller was also bound by the Second Advisor Agreement on April 11, 2024. The agreement identifies Baller as a "British Virgin Island corporation," suggesting but not clearly establishing that Baller became irrevocably liable in the British Virgin Islands. (Ex. K at 1). Supporting this conclusion is the fact that Baller's place of business seems to be in the British Virgin Islands (Ex. G at 1 (listing Baller's "Current Registered Office" in the British Virgin Islands)), despite Plaintiffs' efforts to allege otherwise (FAC ¶ 9 (alleging Baller maintains principal offices in California)).

Whether irrevocable liability attached to Mr. Yavin's signature from Estonia on April 9, 2024, versus OtoCorp's signature from an unpleaded location or Baller's location on April 11, 2024, is an issue "enmeshed in state contract law." *Cavello Bay Reins.*, 986 F.3d at 165 (citing *Absolute Activist*, 677 F.3d at 68). This question becomes even more complex when considering how the Second Advisor Agreement's Payment Terms affected the transaction's irrevocability. (Ex. K at A-2 (Baller "retain[ed] the authority to modify the quantity of tokens allocated within the Advisory pool and the associated vesting and/or unlock periods for said tokens, provided that such adjustments do not result in a reduction of the overall entitlement of tokens[.]")); *see Williams*, 96 F.4th at 140 (finding that the plaintiffs were "contractually obligated" to complete the transactions after committing to them on the Binance exchange, in part because Binance "reserve[d] the right to reject any cancellation reques[t] related to" a submitted trade order in its Terms of Use (internal quotation marks and citations omitted)).

At bottom, the Court is left with three entities that have ostensibly executed the Second Advisor Agreement entirely overseas, and have incurred irrevocable liability at one of these locations. Recognizing this infirmity, Plaintiffs point to Astronomica's alleged "control" of Baller to persuade the Court that there is a domestic hook to this transaction. If Astronomica (a Delaware corporation with its principal offices in California) controlled Baller, and irrevocable liability attached when the parties were bound by the Second Advisor Agreement, then one situs could arguably be the United States by

virtue of Astronomica's control. However, this Court has already granted Astronomica's motion to dismiss for *forum non conveniens*, which moots such an argument. *See supra* Section B.2.b. This is because as a key component of its resolution of that motion, the Court discussed and dispensed with Plaintiffs' conclusory allegations that Astronomica was an alter ego of Baller under its "complete domination and control." *See supra id.*; *see also Koh*, 2023 WL 5352786, at *3 ("[R]epeated assertions that [the defendant] exercised 'complete domination and control' are plainly insufficient on their own.").

Try as it might, the Court cannot identify another location where irrevocable liability attached on the face of the FAC. *See Absolute Activist*, 677 F.3d at 70 ("Absent factual allegations suggesting that the Funds became irrevocably bound within the United States or that title was transferred within the United States, including, but not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money, the mere assertion that transactions took place in the United States is insufficient." (internal quotation marks omitted)). The FAC does not clearly state which entities transferred Beast Coin to Mr. Yavin, which cryptocurrency exchange they used, the quantity of Beast Coin transferred at any one time, the frequency of these transfers, or even when the Beast Coin allocations fully vested. (FAC ¶ 81 (only providing that the full amount of Beast Coin was, at some point, "earned and received")). Granted, Mr. Weinberg is alleged to have promoted Beast Coin and played an active role in negotiating the Second Advisor Agreement on behalf of Baller in California. (*Id.* ¶¶ 70-72).

Tellingly, however, Plaintiffs do *not* assert that Mr. Weinberg's involvement renders the transaction domestic.

These generalized facts, without more, do not indicate any specific location where irrevocable liability attached or title was transferred, as contemplated under *Morrison*. *See Absolute Activist*, 677 F.3d at 70 ("[A]llegations that the Funds were heavily marketed in the United States ... do not satisfy the transactional test announced in *Morrison*."); *see also id.* ("[T]he fact that two of the defendants resided in California does not lead to the plausible inference that the Funds became irrevocably bound to purchase U.S. Penny Stocks in the United States[.]"). Accordingly, the Court holds that Plaintiffs failed to state a claim because they do not adequately allege the existence of a domestic securities transaction.

**ii. The Transaction Was "So Predominantly Foreign"**

Even were the Court to find the transaction to be domestic, Plaintiffs' claims are still "so predominantly foreign" as to be impermissibly extraterritorial under *Parkcentral*. In that case, the Second Circuit considered the extraterritoriality of a securities-based swap agreement entered into in the United States, in which the parties "agree[d] to exchange cash flows" dependent on "the price of a reference security." *Parkcentral*, 763 F.3d at 205 (internal quotation marks and citation omitted). By its very nature, the domestic swap transaction was "a separate and distinct financial instrument from the security it references." *Id.* at 206. The plaintiffs used these domestic securities-based swaps to short the foreign stock of a foreign company. *Id.* at 202-03, 205.

After the foreign company's stock began to "skyrocket" and the plaintiffs' short-selling strategy backfired, the plaintiffs sued the foreign company for allegedly deceptive conduct that occurred in Germany. *Id.* at 204-05. The Second Circuit dismissed the claim, reasoning that even if the securities-based swap agreement constituted a domestic transaction, the entire transaction was "so predominantly foreign as to be impermissibly extraterritorial." *Id.* at 216.

Through its so-foreign inquiry, *Parkcentral* imparted a gloss on *Morrison*'s rule: *First*, "*Morrison*'s 'domestic transaction' rule operates as a threshold requirement, and as such may be underinclusive." *Cavello Bay Reins.*, 986 F.3d at 166 (citing *Parkcentral*, 763 F.3d at 220-21 (Leval, J., concurring)). *Second*, "*Parkcentral* nonetheless uses *Morrison*'s focus on the transaction rather than surrounding circumstances, and flexibly considers whether a claim — in view of the security and the transaction as structured — is still predominantly foreign." *Id.* at 166-67. "[E]ven if a transaction occurs in the United States, the features and incidents of the transaction may nevertheless be so foreign that it is not regulated by [Section] 10(b)." *Id.* at 166. As applied here, even if the Court assumed that Plaintiffs had adequately pleaded a domestic transaction, these same allegations show that the collective transaction is so predominantly foreign that bringing it within the purview of Section 10(b) would be impermissibly extraterritorial.

To review, Plaintiffs' securities claim is based on a private compensation agreement for a private cryptocurrency token distribution between an Estonian independent contractor (Mr. Yavin) and a British Virgin Islands company

(Baller). Mr. Yavin received a percentage of the Beast Coin supply in exchange for his advisory services. Beast Coin is not traded on any domestic exchange or on any registered exchange. Beast Coin is allegedly "intended" to be traded on "cryptocurrency exchanges," but it is unclear (and perhaps unlikely) that these tokens have ever been traded outside the initial distribution to investors. (FAC ¶ 26).

The Second Advisor Agreement's proffered links to the United States are Astronomica (based either in Delaware or California) and Mr. Weinberg (based in California). According to Plaintiffs, these Defendants were involved in the formation of the Second Advisor Agreement. However, even drawing all reasonable inferences in Plaintiffs' favor, the FAC does not suffice to establish a colorable alter ego theory between Baller and Astronomica. *See supra* Section B.2.b. Indeed, the Court has dismissed Astronomica from the suit on *forum non conveniens* grounds precisely because Plaintiffs failed to allege it as an alter ego of Baller; as such, Astronomica cannot be assumed to be part of the negotiation or signing of the Second Advisor Agreement. In addition, the conclusory and generalized allegations that "Defendants freely transferred funds and assets between Astronomica and Baller, treating each as the alter ego of the other" arguably provide colorful atmospherics, but not a well-pleaded claim of fraud. (FAC ¶ 32). If Astronomica has not abused its corporate form — and the FAC does not plausibly plead that is has — this Court will not disregard the separateness of its corporate identity. Without more, Plaintiffs

cannot rely parasitically on Astronomica's nexus to the United States to establish a domestic transaction.

Even if Plaintiffs had raised Mr. Weinberg's actions as another avenue for establishing domesticity, that argument would fall flat. Plaintiffs do not even allege that Mr. Weinberg solicited U.S. investors, which could conceivably implicate U.S. interests. *See Cavello Bay Reins.*, 986 F.3d at 167 (stating that "[p]roviding a domestic forum ought to enhance confidence in U.S. securities markets or protect U.S. investors," but noting that soliciting some U.S. investors "means no more than that someone (else) might have an appropriately domestic claim"). Arguably, Mr. Weinberg's involvement in running Baller as principal and in negotiating the Second Advisor Agreement could "bear upon the threshold question whether the purchaser or seller incurred irrevocable liability in the United States, thereby rendering the transaction 'domestic.'" *Id.* (citing *Absolute Activist*, 677 F.3d at 68). "But acts evincing contract formation do not resolve the question whether the claims are nevertheless so predominantly foreign." *Id.* at 167-68. In view of the totality of the Second Advisor Agreement and the transaction as structured, the "features and incidents" of the transaction are so foreign that it is not properly regulated by Section 10(b). *Id.* at 166. In consequence, Plaintiffs have failed to state a domestic application of Section 10(b).

Accordingly, the Court grants Defendants' motion to dismiss the federal securities claim. Given this resolution, the Court need not address Defendants' arguments about whether the Second Advisor Agreement is an investment

contract, whether Plaintiffs' claims are timely, or whether the alleged misrepresentations are actionable.

### D. The Court Declines to Exercise Supplemental Jurisdiction over the State-Law Claims

Defendants also move to dismiss Plaintiffs' various state-law claims — namely, for breach of contract arising under New York and British Virgin Islands law (FAC ¶¶ 122-141), and quantum meruit, unjust enrichment, promissory estoppel, negligent misrepresentation, and fraudulent inducement under New York law (*id.* ¶¶ 142-182; Def. Br. 17-18). As a general matter, when federal claims are dismissed before trial, "even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *First Cap. Asset Mgmt., Inc.* v. *Satinwood, Inc.*, 385 F.3d 159, 183 (2d Cir. 2004) (quoting *Castellano* v. *Bd. of Trs.*, 937 F.2d 752, 758 (2d Cir. 1991)); *see also Brzak* v. *United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) ("[I]f a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." (internal quotation marks and citation omitted)). Here, without a viable federal claim, no circumstances counsel in favor of the Court exercising supplemental jurisdiction over Plaintiffs' state-law claims, and factors of convenience, fairness, and comity do not require the Court to exercise supplemental jurisdiction. *See El-Nahal* v. *Yassky*, 993 F. Supp. 2d 460, 470 (S.D.N.Y. 2014) ("[T]he assertion of supplemental jurisdiction over plaintiff's state-law claims would be inappropriate in the absence of related federal claims."), *aff'd*, 835 F.3d 248 (2d Cir. 2016). Accordingly, the Court declines to

exercise supplemental jurisdiction over the state-law claims and dismisses them without prejudice.

**E. The Court Denies Plaintiffs Leave to Amend**

Finally, Plaintiffs request leave to amend their pleading "if personal jurisdiction is not found," or "if Plaintiffs' damages allegations" with respect to the state-law claims are found to be "insufficient." (Pl. Opp. 22 n.3, 30). Plaintiffs have not sought leave to amend if the Court were to grant any other part of Defendants' motion. Without an application requesting leave to amend the federal claim, the Court will not grant one *sua sponte*. *See Hauschild* v. *United States Marshals Serv.*, No. 21 Civ. 7580 (CS), 2023 WL 2413934, at *12 (S.D.N.Y. Mar. 8, 2023) (collecting cases), *aff'd*, No. 23-778-cv, 2024 WL 158899 (2d Cir. Jan. 12, 2024) (summary order).

The Court notes that, by failing to make such an application, Plaintiffs implicitly concede that repleading the federal securities claim would be futile. *See Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000) (finding that amendment is futile if the "amended portion of the complaint would fail to state a cause of action"); *see also Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (permitting amendment where altered pleadings would be "sufficient to withstand a motion to dismiss"). On this point, they are correct: Plaintiffs have previously amended their complaint with the benefit of a pre-motion letter from Defendants (Dkt. #20-21 (parties' pre-motion submissions)) and a pre-motion conference (Dkt. #22). And even if Plaintiffs were able to replead a domestic transaction under *Absolute Activist*,

the Court has no confidence that Plaintiffs could satisfy *Parkcentral*'s "so-foreign" inquiry. In other words, amendment would not cure the pleading deficiencies that led the Court to dismiss the federal securities claim under Rule 12(b)(6), so leave to amend would be futile.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. In particular, the Court dismisses Plaintiffs' claims against Defendant Astronomica without prejudice; Plaintiffs' federal claims against Defendants Weinberg and Baller with prejudice; and Plaintiffs' state-law claims against Defendants Weinberg and Baller without prejudice to their refiling in state court.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining deadlines, and close this case.

SO ORDERED.

Dated: September 2, 2026
New York, New York

Katherine Polk Failla

KATHERINE POLK FAILLA
United States District Judge